**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TYRONE WATSON,**

                    **Plaintiff,**

**v.**                                                      **1:15-cv-1356 (BKS/DEP)**


**JOHN DOE,** *Kingston Police Department*, **et al.**

                    **Defendants.**
_____

**APPEARANCES:**

Tyrone Watson
13-A-4239
Eastern NY Correctional Facility
Box 338
Napanoch, NY 12458
Pro se Plaintiff


**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.        INTRODUCTION**

        Plaintiff Tyrone Watson, a New York State inmate, commenced this civil rights action

under 42 U.S.C. § 1983, against two John Doe defendants who are members of the Kingston

Police Department. Dkt. No. 1. Plaintiff alleges that defendants used excessive force against him

during an unlawful arrest on October 18, 2012, and refused him medical attention for his injuries.

*Id.*

        Plaintiff's complaint and application to proceed *in forma pauperis* were forwarded to

United States Magistrate Judge David E. Peebles to review the sufficiency of the claims under 28

U.S.C. § 1915(e).[1]   On December 21, 2015, Magistrate Judge Peebles issued a Report, Recommendation, and Order recommending that plaintiff's Fourteenth Amendment deliberate medical indifference claim be dismissed, without prejudice, with leave to amend.  Dkt. No. 6, p. 12.  Judge Peebles further recommended that in the event the Report Recommendation is adopted and plaintiff fails to amend his complaint by the deadline set by the assigned district judge, plaintiff's complaint be accepted for filing, except as to his deliberate medical indifference claim, and that the Clerk of the Court add the City of Kingston Chief of Police, Gilles M. Larochelle, as a defendant for purposes of service and discovery.  *Id.*  Magistrate Judge Peebles advised plaintiff that, under 28 U.S.C. § 636(b)(1), failure to file written objections to the Report Recommendation within fourteen days "will preclude appellate review." *Id.*

On January 7, 2016, plaintiff filed an amended complaint.  Dkt. No. 7.  The amended complaint contains additional facts regarding plaintiff's excessive force, false arrest, and deliberate indifference claims.  *Id.*  The amended complaint also contains allegations, which, viewed liberally, appear to assert a municipal liability claim under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), against the City of Kingston.  *Id.*  To date, plaintiff has not filed any objections to the Report Recommendation.

## II.    STANDARD OF REVIEW

As no objections to the Report Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report Recommendation for clear error. *See Glaspie v. N.Y.C. Dep't of Corr.*, No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844, at *1, 2010 U.S. Dist. LEXIS 131629, at *2-3 (S.D.N.Y. Nov. 30, 2010) (explaining that when no objections

---

[1] Section 1915(e) directs that when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

to report and recommendation are made, "the Court may adopt [it] if there is 'no clear error on the face of the record.'") (quoting *Adee Motor Cars, LLC v. Amato*, 388 F. Supp. 2d 250, 253 (S.D.N.Y. 2005)).

## III.    DISCUSSION

### A.    Excessive Force and False Arrest

The Court has reviewed the Report Recommendation with respect to the excessive force and false arrest claims for clear error and found none.  The Court therefore adopts Magistrate Judge Peebles' conclusion that plaintiff's allegations asserting excessive force and false arrest are sufficient to survive review under 28 U.S.C. § 1915(e).  Dkt. No. 6, p. 7.  As the amended complaint only supplements the facts regarding the incident which forms the basis for plaintiff's excessive force and unlawful arrest claims, *see* Dkt. No. 1, p. 5; Dkt. No. 7, pp. 2-3, the Court likewise concludes that these claims, as amended, survive review under § 1915(e).

### B.    Deliberate Indifference

Magistrate Judge Peebles found that the original complaint failed to allege sufficient facts to state a claim that the defendant police officers were deliberately indifferent to his serious medical needs.  In light of the fact that plaintiff has filed an amended complaint, however, which adds new allegations regarding the deliberate indifference claim, Magistrate Judge Peebles' recommendation that the deliberate indifference claim in the complaint be dismissed is now moot.  The Court has therefore considered the sufficiency of the amended complaint, in light of 28 U.S.C. § 1915(e)(2)(B), to determine whether the new factual allegations concerning deliberate medical indifference cure the deficiencies identified in the Report Recommendation. After considering the allegations in the amended complaint liberally, with deference to plaintiff's

*pro se* status, the Court finds that plaintiff has failed to state a claim of deliberate medical indifference.

In the amended complaint, plaintiff alleges that John Doe #2 "punched [him] in the face;" that both officers "wrestled [him] to the ground;" and that he was "being choked and told to stop resisting." Dkt. No. 7, p. 2. Plaintiff alleges that his "nose was bleeding" and he "was barely coherent." *Id.* Plaintiff alleges that after he was put in the police car he "asked to be taken to the hospital, not knowing if my nose was broken or not; because it wouldn't stop bleeding." *Id.* He alleges that the officers ignored him and brought him "straight to the police station." He alleges that at the police station he again asked to be brought to the hospital "because my nose was still bleeding." *Id.* Plaintiff states that he was "once again ignored," but does not identify who at the police station ignored his request. Plaintiff asserts that the defendants "acted with deliberate indifference, fully aware of the substantial risk of serious harm exist [sic] at the time of the incident." *Id.* at 3.

A claim of deliberate indifference to serious medical needs has an objective prong and a subjective prong. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996). As set forth in Magistrate Judge Peebles' Report Recommendation, to establish a claim of deliberate medical indifference, the objective component requires a plaintiff to allege that the deprivation was "sufficiently serious;" the subjective component requires a plaintiff to allege and that the defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994); *Caiozzo v. Koreman*, 581 F.3d 63, 71 (2d Cir. 2009) (applying *Farmer* test to pre-trial detainees). Factors that should be considered in assessing whether a medical need is sufficiently serious include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of

comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

Here, plaintiff has not alleged that his nose was broken; nor has he identified any medical treatment that he needed. Plaintiff did not allege how long his nose was bleeding, or describe any pain associated with his injury. Thus, even viewing his pro se allegations with leniency, the allegations fail to allege a serious medical need. *See Munlyn v. Pietrie*, No. 13-CV-6170FPG, 2014 WL 3695488, at *6, 2014 U.S. Dist. LEXIS 101274, at *16 (W.D.N.Y. July 24, 2014) (finding that the complaint failed to allege a serious medical condition where only the allegation was that the plaintiff "was 'in pain,'" and there were no allegations regarding, among other things, "the level or extent of the pain . . . any resulting inability to engage in normal activities, or any harm consequently experienced or likely to occur."). Further, although plaintiff alleged that he asked the defendant officers to take him to the hospital because his nose "wouldn't stop bleeding," Dkt. No. 7, ¶ 8, he has not alleged that he told the officers that he was in pain or that his nose was broken. Thus the complaint, even construed liberally, fails to allege that the officers were aware that their failure to take plaintiff to the hospital for prompt medical treatment posed a substantial risk of serious harm to plaintiff. *Hathaway*, 99 F.3d at 552 (holding that the subjective component requires that "the charged official must act with a sufficiently culpable state of mind," which "is the equivalent of criminal recklessness."). *C.f.*, *Lasher v. City of Schenectady*, No. 02-CV-1395, 2004 WL 1732006, at *5, 2004 U.S. Dist. LEXIS 14870, at *17 (N.D.N.Y. Aug. 3, 2004) (finding evidence that plaintiff's nose was broken and bleeding for approximately two hours raised a triable issue of fact regarding a serious medical need); *Riles v. Bannish*, No. 3:10-CV-652 (RNC), 2010 WL 3169391, at *4, 2010 U.S. Dist. LEXIS 80920, at

*11 (D. Conn. Aug. 11, 2010) (finding allegations that doctor denied pain medication, after plaintiff complained of excruciating pain, and failed to timely diagnose and treat the plaintiff's broken nose were sufficient to state a claim of deliberate indifference). Because it is possible that plaintiff could state a plausible medical indifference claim, the claim is dismissed with leave to amend. If plaintiff seeks to amend the complaint, he should note that any amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). He should further note the information provided by Magistrate Judge Peebles in the Report Recommendation. Dkt. No. 6, pp. 9-10.

### C. Municipal Liability - *Monell*

A municipality may not be held liable under § 1983 on the basis of respondeat superior. *Monell*, 436 U.S. at 694-95. Rather, municipalities are responsible only for "their own illegal acts," *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986), and are not vicariously liable for civil rights violations perpetrated by their employees. *See Monell*, 436 U.S. at 691. In order to sustain a §1983 claim for municipal liability, a plaintiff must show that he suffered a constitutional violation, and that the violation resulted from an identified municipal policy or custom. *Monell*, 436 U.S. at 694-695. A municipal policy or custom may be established by any of the following: (1) a formal policy, officially promulgated by the municipality, *id*. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur*, 475 U.S. at 483-84; (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-30 (1985) (plurality opinion); or (4) a failure to train or supervise that amounts to "deliberate

indifference" to the rights of those with whom the municipality's employees interact.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Read liberally, the amended complaint appears to allege, under the fourth theory, that the City of Kingston[2] had a custom or policy of tolerating the use of excessive force and police misconduct in executing arrests and that it failed to properly train or supervise its officers in these areas.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  Here, plaintiff alleges that "Kingston Police Chief, Gilles M. Larochelle is responsible for teaching his officers the protocol and etiquette when dealing with civilians in the community."  Dkt. No. 7, ¶ 4.  Plaintiff further alleges that the "deliberate and extreme excessive force, and police brutality, and unlawful arrests" he allegedly suffered "at the hands of the Kingston Police Department," Dkt. No. 7, ¶ 10, were not "isolated incident[s]," Dkt. No. 7, ¶ 9, but rather part of a "patern" [sic] of unconstitutional conduct that has existed in "the Kingston Police Department from 2012-back to 1995."  Dkt. No. 7, ¶ 10.  In addition to his allegations concerning his October 2012 excessive force and false arrest claims that are the subject of this action, plaintiff recounts incidents from July 2012 and March 1995 during which officers from the Kingston Police Department allegedly subjected him to excessive force and unlawfully arrested him.  *See, e.g.*, Dkt. No. 7, ¶ 9 ("The officer grabs my arm and with his other arm chokes me while another officer puts handcuffs on me"); Dkt. No. 7, ¶ 10 (while laying down on his "stomach in the mud . . . [t]he officer hits me in the temple area of my head

---

[2] Although not identified in the caption as a defendant, affording plaintiff the solicitude he is due as a pro se litigant, the Court construes the amended complaint as raising a claim against the City of Kingston. *See Gonzalvo v. State of New York*, No. 9:11–cv–0909, 2013 WL 4008881, at *2, 2013 U.S. Dist. LEXIS 108490, at * *6-7 (N.D.N.Y. July 10, 2013) (district court's authority to substitute defendants in pro se complaint sua sponte is "well supported," collecting cases), *report and recommendation adopted by Gonzalvo v. State of New York*, No. 9:11-cv-0909, 2013 WL 4008881, 2013 U.S. Dist. LEXIS 108403 (N.D.N.Y. Aug. 2, 2013).  The Clerk of Court is directed to amend the caption accordingly.

knocking me out. When I wake up the police Rottweiler was ripping my thigh apart on my right leg")).” *Id.* These assertions, read liberally in combination with the facts in the complaint, sufficiently allege a series of incidents during which City of Kingston police officers subjected him to excessive force and falsely arrested him to warrant an inference that their conduct was attributable to inadequate training or supervision amounting to deliberate indifference. *See Tyus v. Newton*, No. 3:13-CV-1486 SRU, 2015 WL 1471643, at *11, 2015 U.S. Dist. LEXIS 42089, at * 29-30 (D. Conn. Mar. 31, 2015) (“In view of the number of alleged unconstitutional traffic stops, searches, and arrests involving the plaintiff and at least one other individual prior to the incidents involving the plaintiff, I conclude that the plaintiff has alleged sufficient facts to state a plausible claim that the City of New London had a custom or policy of tolerating police misconduct and acted with deliberate indifference by poorly training or supervising its officers regarding motor vehicle stops, detentions, pat-down and body cavity searches, and arrests”); *Castilla v. City of New York*, No. 09 Civ. 5446(SHS), 2012 WL 3871517, at **4–5, 2011 U.S. Dist. LEXIS 95619, at *12  (S.D.N.Y. Sept. 6, 2012) (denying motion for judgment on the pleadings regarding municipal liability because plaintiff alleged “a string of incidents in which she was victimized by multiple officers in multiple locations, both on and off City property” as well as “various other instances of male police officers taking sexual advantage of females under their custody or control”)

## IV.    CONCLUSION

For these reasons, it is

**ORDERED** that the amended complaint (Dkt. No. 7) is **ACCEPTED AS FILED**; and it is further;

**ORDERED** that the Report Recommendation (Dkt. No. 6) is **ADOPTED** as it applies to the amended complaint; and it is further

**ORDERED** that plaintiff's Fourteenth Amendment deliberate medical indifference claim is **DISMISSED without prejudice and with leave to amend**; and it is further

**ORDERED** that if plaintiff wishes to file a second amended complaint that correct the pleading defects identified with respect to his Fourteenth Amendment deliberate indifference claim, he shall do so within **thirty (30) days of the date of this order**; and it is further

**ORDERED** that any second amended complaint plaintiff submits shall be a complete pleading, which will supersede the amended complaint, and may not incorporate any portion of the original or amended complaints by reference, in accordance with Local Rule 7.1(a)(4) of the Local Rules of Practice for this District; and it is further

**ORDERED** that the Clerk of the Court shall add the City of Kingston as a defendant in this action and amend the caption accordingly; and it is further

**ORDERED** that once the City of Kingston has filed an answer, plaintiff must seek, through discovery, the identity of the Doe defendants; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service of process, the Clerk of the Court shall issue a summons, together with a copy of plaintiff's amended complaint, and forward them to the United States Marshal for service upon the City of Kingston; and it is further

**ORDERED** that, after service of process on defendant City of Kingston, it shall file a response to the amended complaint as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that the Clerk of Court shall mail a copy of this Memorandum-Decision and Order to plaintiff along with copies of the unpublished decisions cited in this decision.

**IT IS SO ORDERED.**

**Dated:  January 28, 2016**

Brenda K. Sannes
U.S. District Judge

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Norton v. Town of Islip,   E.D.N.Y.,   January 21, 2016

2012 WL 3871517
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Lilian CASTILLA, Plaintiff,
v.
CITY OF NEW YORK, New York City Police
Detective Oscar Sandino, Tax Id # 919673
Individually and as a Detective of New
York City Police Department, and Police
Officers John Doe Officers 1–10, Defendants.

No. 09 Civ. 5446(SHS).
|
Sept. 6, 2012.

### Opinion

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiff Lilian Castilla brings this civil rights action pursuant 42 U.S.C. §§ 1983 and 1985 against defendants the City of New York, police detective Oscar Sandino, and John Doe police officers. She alleges that Sandino, with the assistance of the John Doe police officers, sexually assaulted and repeatedly threatened her in violation of the United States Constitution. The City has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on the grounds that plaintiff fails to state a viable claim for municipal liability and that she cannot maintain any state law claims against any defendants. Because Castilla specifically states that she is not asserting any state law claims, (see Pl.'s Mem. in Opp. at 15), there is no need to dismiss any such claims. However, plaintiff has stated plausible claims for municipal liability against the City; accordingly, the City's motion for judgment on the pleadings is denied.

### I. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Amended Complaint and presumed true for purposes of this motion.

On February 16, 2008, New York Police Department ("NYPD") detective Oscar Sandino and other members of the NYPD entered Castilla's apartment to execute a search warrant. (Am.Compl.¶ 14.) Sandino followed Castilla into a bedroom and then demanded that she strip for him. (Id. ¶¶ 14–16.)Castilla complied with his demand. (Id. ¶ 17.)After questioning Castilla about her boyfriend and his drug activities and threatening her with the loss of custody of her children, detective Sandino directed that Castilla and her boyfriend be taken to the police precinct in separate cars. (Id. ¶¶ 20–21.)

According to Castilla, Sandino and another officer drove her around Queens, continuing to threaten her with the loss of custody of her children. (Id. ¶¶ 22–26.)The other officer eventually got out of the vehicle, at which point Sandino asked Castilla what she was willing to do to keep her kids and if she was willing to be "bedded." (Id. ¶¶ 27–30.)Sandino ultimately left the vehicle, and two other detectives drove Castilla to the NYPD's 110th Precinct, where she was held for an hour or two. (Id. ¶¶ 32–33.)

At the precinct, Sandino brought Castilla into an interrogation room. (Id. ¶ 35.)While alone with her there, Sandino asked her answer to his earlier sexual proposition. She demurred, and he again threatened to take away her kids and also threatened physical violence. (Id. ¶¶ 43–47.)Just at one point, another detective entered the interrogation room. (Id. ¶ 38.)Sandino and this other detective attempted to recruit Castilla as a confidential informant by using threats against her children and referring to a potential "deal" between Castilla and Sandino. (Id. ¶¶ 38–40.)

Castilla asked to use the bathroom and Sandino took her there. He allegedly followed her into the bathroom, displayed his gun, ordered her to undress, and molested and sodomized her in a stall. (Id. ¶¶ 49–55.)Another officer allegedly helped Sandino isolate Castilla in the bathroom and remained in the immediate vicinity of the bathroom while Castilla was in there with Sandino.(Id. ¶¶ 50, 56.)None of the individual defendants present at the precinct asked why Sandino was alone with Castilla in the interrogation room or in the bathroom, and none of them reported Sandino's activity to superiors. (Id. ¶¶ 57–59.)

**\*2** Following this incident at the precinct, according to the complaint, Sandino repeatedly called and texted Castilla in order to arrange additional sexual encounters. (Id. ¶¶ 61–69.)He continued to contact her even after her boyfriend's

defense attorney asked him not to do so. (*Id.* ¶¶ 72–74.)Sandino also allegedly called Castilla's brother to threaten removal of her children if she did not return his calls. (*Id.* ¶¶ 75–78.)Moreover, when an Administration for Children's Services caseworker was interviewing Castilla at her parents' apartment on February 19, 2008, Sandino and another officer showed up. (*Id.* ¶ 80.)Sandino took Castilla into a room and tried to intimidate her into staying silent about the sexual relationship he was pursuing with her. (*Id.* ¶¶ 83–87.)

In March 2008, Castilla met with the NYPD Internal Affairs Bureau (the "IAB") and provided recordings of calls Sandino had made to her and copies of text messages he had sent her. (*Id.* ¶ 88.)The IAB gave her a recording wire for a meeting with Sandino, which took place on March 11, 2008. (*Id.* ¶ 89.)At their meeting, Sandino was apparently suspicious of Castilla and made threats.(*Id.* ¶ 90.)Castilla was so frightened by Sandino that the IAB "whisked her away." (*Id.* ¶ 91.)

According to Castilla, the individual defendants who acted in concert with Sandino continue to work for the NYPD and have not faced any charges as a result of their misconduct. (*Id.* ¶ 92.)Castilla also alleges that the individual defendants conspired to obstruct and cover up any investigation of her claims. (*Id.* ¶¶ 95–99.)

Castilla commenced this action in 2009. She brings various civil rights claims against individual officers and municipal liability claims against the City. The municipal liability claims are the subject of this motion.

Castilla specifically alleges that the City has a "policy and practice which provides practically unimpeded control over female suspects and prospective female confidential informants, and which fails to explicitly prohibit the use of sexual dominance and gender exploitative control tactics that seek to further investigative ends and individual officer[s'] personal prurient desire [s]." (*Id.* ¶ 12.)She further alleges inadequate training, supervision, and discipline of officers, as well as a deeply ingrained "code of silence" regarding police misconduct of this type. (*Id.* ¶¶ 126–129.)As a result of these policies and practices, the City has allegedly "exhibit[ed] deliberate indifference to the constitutional rights of its citizens."(*Id.* ¶ 125.)

Moreover, according to Castilla, the City "has been on notice of a significant and pervasive problem of police officers' use of their position and power to abuse female suspects, prospective confidential informants, and

confidential informants."(*Id.* ¶ 100.)In particular, she claims that "defendant Sandino had prior incidences of sexual abuse against females within his custody and control."(*Id.* ¶ 13.)She also refers to various news reports of incidents involving other police officers who isolated females and then sexually assaulted them while they were in the custody or control of those officers.(*Id.* ¶¶ 105–06, 109.)

**\*3** In addition, the Court takes judicial notice of the fact that Sandino pled guilty to two counts of deprivation of civil rights, one of which arose from events that Castilla has alleged in this complaint, at least as far as Sandino's own activities are concerned. In May of this year, Sandino was sentenced by a federal judge principally to 24 months' imprisonment for those crimes. (*See* Judgment in *United States v. Sandino,* Cr. 10–331 (E.D.N.Y. May 19, 2010).)

As noted above, the City now moves for judgment on the pleadings pursuant to Rule 12(c) on the ground that Castilla has failed to state a claim for municipal liability.

## II. DISCUSSION

### A. *Legal Standard*

In deciding a motion under Rule 12(c), courts apply the same standard that applies on a motion to dismiss a claim for relief pursuant to Rule 12(b)(6).*Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). Accordingly, a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face."*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)."A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."*Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 556).

### B. *Municipal Liability*

To sustain a claim for relief pursuant to section 1983 against a municipal defendant, a plaintiff must show (1) the existence of an officially adopted policy or custom and (2) a causal connection between the custom or policy and the deprivation of a constitutional right *See Monell v. Dep't of Social Servs.,*

436 U.S. 658, 694 (1978); *Walker v. City of New York,* 974 F.2d 293, 301 (2d Cir.1992).

A plaintiff may demonstrate the existence of a policy or custom in a variety of ways. First, she may provide evidence of a formal policy officially adopted by the municipality. *Monell,* 436 U.S. at 690. Second, a single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered a policy and thus subject a municipality to liability. *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 404–06 (1997); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–84 (1986). Third, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware. *Brown,* 520 U.S. at 403–04; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988); *Monell,* 436 U.S. at 690–91. Fourth, where a municipality's failure to provide adequate training or supervision of its agents rises to the level of deliberate indifference, section 1983 liability may lie against the municipality.*Brown,* 520 U.S. at 407; *City of Canton v. Harris,* 489 U.S. 378, 388 (1989); *Cash v. Cnty. of Erie,* 09–4371, 2011 WL 3625003, at *7 (2d Cir. Aug. 18, 2011). However, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."*DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

### C. *Application*
 **\*4** Castilla does not claim that the City's liability pursuant to *Monell* and its offspring arises from a formal City policy or an unconstitutional act by an authorized decision-maker. Rather, she alleges, under the third and fourth theories, a widespread custom of at least tolerating male police officers' sexual misconduct, and a failure to train, supervise, and/or discipline male police officers in connection with their handling female detainees and informants. Taking plaintiffs' allegations as true, the Court finds that Castilla has sufficiently pled claims for *Monell* liability against the City of New York.

This finding is based, in part, on the Second Circuit's recognition that "[it] is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation ."*Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 130 n. 10 (2d Cir.2004). The Second Circuit has not yet addressed whether *Iqbal* has heightened

the pleading requirements for such a municipal liability claim, but district courts in this Circuit have continued, post-*Iqbal,* to apply the pleading standard articulated in *Amnesty* to a *Monell* claim based on a failure to train. *See Ferrari v. Cnty. of Suffolk,* No. 10 Civ. 4218, 2011 WL 2297125, at *9 (E.D.N.Y. Jun. 7, 2011); *Williams v. City of New York,* 690 F.Supp.2d 338, 346 (S.D.N.Y.2010); *Michael v.. County of Nassau,* No. 09 Civ. 5200, 2010 WL 3237143, at *4 (E.D.N .Y. Aug. 11, 2010). Thus, in assessing the sufficiency of plaintiff's *Monell* claims—particularly the failure to train claim—the Court keeps in mind that plaintiff has not yet had the full benefit of discovery.

The City's position cannot be ignored. The City contends that this case simply concerns an isolated incident involving a single rogue police detective. The City may be right. However, the alleged facts, taken as true for purposes of this motion, plausibly suggest otherwise. Plaintiff alleges that multiple detectives and officers helped Sandino threaten, abuse, and sexually assault Castilla over many hours and in many locations, including at a police precinct. The complaint specifically alleges concerted action by other police officers in addition to Sandino who were not supervised and at least not immediately stopped or disciplined. Sandino is alleged to have continued for weeks after the assault to contact, proposition, and threaten Castilla. When Sandino paid Castilla a visit at her family's home, Sandino was accompanied by another officer. Furthermore, Castilla alleges that the police officers maintained a "code of silence" to cover up their misconduct.

In *Michael v. County of Nassau,* the U.S. district court in the Eastern District of New York found, on a motion to dismiss decided under *Iqbal,* that an informal custom "of at least tolerating police misconduct" and/or a failure to properly train police officers could be inferred where the alleged conduct took place over several hours, including at police headquarters, and several officers participated in the repeated denials of the plaintiff's rights. 2010 WL 3237143, at *4. Castilla, like the plaintiff in the *Michael* case, alleges a string of incidents in which she was repeatedly victimized by multiple officers in multiple locations, both on and off City property.

 **\*5** More than that, Castilla alleges various other instances of male police officers taking sexual advantage of females under their custody or control. In *Ferrari v. County of Suffolk,* which was decided after *Iqbal,* the court allowed a *Monell* claim to survive a motion to dismiss in light of allegations of two

instances of unconstitutional conduct in addition to plaintiff's own claim. 2011 WL 2297125, at *9. *See also Colon v. City of New York,* Nos. 09 Civ. 8–9, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009); *cf. Cash,* 2011 WL 3625093 at *9 (finding that a jury could reasonably conclude that a single prior complaint of sexual exploitation, in light of prison guards' duty to protect prisoners, could put a municipality on notice that its existing policy was insufficient to deter such misconduct). Although the City challenges the admissibility of the evidence plaintiff cites as relevant examples of police misconduct, the Court need not decide that issue at this time.

Finally, the City argues that plaintiffs' allegations do not demonstrate an unconstitutional policy or custom, but rather show the opposite: a readiness on the part of the City to investigate and discipline police officers who misbehave. In particular, the City points to the IAB's responsiveness to Castilla's IAB complaint and the fact that Sandino was ultimately punished for his wrongdoing. While these facts inure to the City's benefit on this motion, Castilla also alleges that not all the individual perpetrators have been investigated and disciplined. In any event, the issue of whether the City eventually investigates and disciplines employees accused of misconduct is distinct from whether the City was deliberately indifferent to the violation of citizens' constitutional rights in

the first place. In other words, even if the City took corrective action, its training and supervision of male officers vis-a-vis female detainees and informants still may have been inadequate.

The Court is not evaluating the ultimate merits of plaintiff's *Monell* claims here. The Court is simply finding that the allegations of very serious police misconduct, supported by adequate facts, raise an inference of municipal liability that is plausible enough to permit the claims to proceed.

### III. CONCLUSION

Accordingly, for the reasons set forth above, the City's motion for judgment on the pleadings with respect to Castilla's claims against the City is denied. Plaintiff is entitled to discovery regarding the City's policies and practices regarding training, supervision, and discipline in connection with male officers' handling of female suspects, prospective confidential informants, and informants.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3871517

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4967844
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Gordon GLASPIE, Plaintiff,

v.

NEW YORK CITY DEPARTMENT OF
CORRECTIONS, et al., Defendants.

No. 10 CV 00188(GBD)(JCF).
|
Nov. 30, 2010.

### *MEMORANDUM DECISION AND ORDER*

GEORGE B. DANIELS, District Judge.

**\*1** *Pro se* Plaintiff Gordon Glaspie filed this suit under 42 U.S.C. § 1983, alleging that Defendants violated his civil rights by assigning him to a cell block area where swine flu (H1N1) cases had been discovered. Plaintiff alleged injuries of mental and emotional stress. Defendants moved to dismiss Plaintiff's Complaint on two grounds: (1) FED. R. CIV. P. 12(b)(1) for Plaintiff's failure to exhaust his administrative remedies; and (2) FED. R. CIV. P. 12(b)(6) for Plaintiff's failure to state a claim. This Court referred the motion to Magistrate Judge James C. Francis IV for a Report and Recommendation ("Report"). Magistrate Judge Francis recommended that the Defendants' motion to dismiss for failure to state a claim be granted.

The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. 28 U.S.C. § 636(b)(1). When there are objections to the Report, the Court must make a *de novo* determination of those portions of the Report to which objections are made. *Id.; see also Rivera v. Barnhart,* 432 F.Supp.2d 271, 273 (S.D.N.Y.2006). The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. *See* FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1)(c). It is not required, however, that the Court conduct a *de novo* hearing on the matter. *See United States v. Raddatz,* 447 U.S. 667, 676 (1980). Rather, it is sufficient that the

Court "arrive at its own, independent conclusions" regarding those portions to which objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189–90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). When no objections to a Report are made, the Court may adopt the Report if "there is no clear error on the face of the record." *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005) (citation omitted).

In his report, Magistrate Judge Francis advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). This Court has received no objections to the Report, and the time to do so has expired.

Magistrate Judge Francis properly determined that Plaintiff failed to adequately allege a deprivation of "basic human needs" that was "objectively sufficiently serious." Plaintiff, therefore, did not identify conduct constituting an Eighth Amendment violation for cruel and unusual punishment. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994). In particular, Magistrate Judge Francis found that: (1) mere exposure to swine flu does not involve an "unreasonable risk of serious damage to ... future health"; (2) no residual risk exists because Plaintiff was moved to a different correctional facility; and (3) the Amended Complaint lacked factual allegations of an illness resulting from Plaintiff's exposure or risk of latent health effects. *Helling v. McKinney,* 509 U.S. 25, 35–36 (1993); *see also* Report at 7 (collecting cases). [1]

[1]   As to the Rule 12(b)(1) ground for dismissal, Magistrate Judge Francis determined that, "because the instant motion can be determined on other grounds, it need not be determined whether plaintiff exhausted his claims." Report at 3; *see* 42 U.S.C. § 1997e(c)(2); *Woodford v. Ngo,* 548 U.S. 81, 85, 101 (2006) (the "exhaustion requirement is not jurisdictional, and thus [allows] a district court to dismiss plainly meritless claims without first addressing what may be a such more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies")

**\*2** After carefully reviewing the Report and Recommendation, this Court finds that the Report is not facially erroneous, and adopts the Report's recommendation to dismiss all claims against all Defendants. The Defendants' motion to dismiss is GRANTED.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4967844

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4008881
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rubin GONZALVO, Plaintiff,

v.

The STATE OF NEW YORK, Defendant.

No. 9:11–CV–0909 (NAM/DEP).
|
Aug. 2, 2013.

**Attorneys and Law Firms**

Ruben Gonzalvo, Woodburne, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney General, Cathy Sheehan, Esq, Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

## *ORDER*

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge David E. Peebles, duly filed on the 10th day of July 2013. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The defendant's motion to dismiss for failure to state a claim (Dkt. No. 29) is denied.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Ruben Gonzalvo, a New York State prison inmate, has commenced this action pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.,* and section 504 of the Rehabilitation Act ("section 504"), 29 U.S.C. § 794. In his complaint, Gonzalvo generally alleges that, as a qualified individual with a disability under the ADA, the defendant, the State of New York, wrongfully denied him the right to participate in or the benefit from sign language classes.

Currently pending before the court is the State of New York's motion seeking dismissal of plaintiff's complaint based upon its assertion that the court lacked jurisdiction to *sua sponte* deem plaintiff's complaint amended to substitute the State of New York as the sole defendant. Having carefully reviewed defendant's motion, I recommend that the motion be denied.

### I. *BACKGROUND*

Plaintiff is a prison inmate who is now being held in the custody of the New York Department of Corrections and Community Supervision ("DOCCS").*See generally* Compl. (Dkt. No. 1). At all times relevant to this action, plaintiff was confined at the Eastern Correctional Facility ("Eastern"), located in Napanoch, New York. *Id.* at 6.

Construed liberally, plaintiff's complaint alleges that he qualifies as a disabled person under the ADA and section 504 because he is deaf or hearing impaired. Compl. (Dkt. No. 1) at 7–10.According to plaintiff, several of the originally named defendants, all of whom are no longer parties to this action and are employed by the DOCCS, failed to provide him with access to participation in sign language classes. *Id.* at 11–12.It is alleged that plaintiff is in need of sign language classes in order to learn "another way of communication." *Id.* at 13.

### II. *PROCEDURAL HISTORY*

This action was commenced on August 3, 2011, by the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Compl. (Dkt. No. 1). Although plaintiff Gonzalvo is the only remaining plaintiff, the complaint named five other plaintiffs that have now been dismissed from the case by virtue of a decision and order issued on May 4, 2012, by District Judge Norman A.

Mordue. Decision and Order (Dkt. No. 11). Additionally, the complaint named six individual defendants, five of whom were dismissed following Judge Mordue's initial review of the complaint. Decision and Order (Dkt. No. 5). Service of process could not be effectuated with respect to the remaining defendant, identified in the complaint as "Mr. Williams," because he is deceased. Decision and Order (Dkt. No. 22). Accordingly, Judge Mordue dismissed that defendant from the action, and *sua sponte* "deem[ed] the complaint amended to name the State of New York as the sole defendant."*Id.* Plaintiff's complaint asserts two causes of action, one under the ADA and another under section 504, but it fails to set forth a prayer for relief. *See generally* Compl. (Dkt. No. 1).

**\*2** On December 19, 2012, in lieu of an answer, defendant filed a motion seeking dismissal of plaintiff's complaint, arguing that the court lacked jurisdiction to *sua sponte* amend the complaint on behalf of the plaintiff to name the State of New York as the sole defendant. Def.'s Memo of Law (Dkt. No. 29–1) at 4–6.Defendant's motion, to which plaintiff failed to respond, [1] is now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).*See also*Fed.R.Civ.P. 72(b).

[1]  Plaintiff's failure to oppose defendant's motion does not preclude the court from recommending disposition of its motion. *See, e.g., White v. Mitchell,* No. 99–CV–8519, 2001 WL 64756, at \*1 (E.D.N.Y.Jan. 18, 2001). Because a motion to dismiss tests only the legal sufficiency of a plaintiff's complaint, the court can determine a complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the relevant case law. *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). Before granting an unopposed motion, however, the court must make a threshold finding that the moving party has met its burden demonstrating entitlement to that relief. *McCall,* 232 F.3d at 323.

### III. *DISCUSSION*

In a decision and order dated September 19, 2012, Judge Mordue held that, "[i]n light of plaintiff's pro se status, ... the Court hereby dismisses Williams as a defendant and deems the complaint amended to name the State of New York as the sole defendant."Decision and Order (Dkt. No. 22) at 2. Judge Mordue explained that, because the proper party to sue under the ADA and section 504 is either the public entity responsible for the conduct in dispute, or a public official acting in his official capacity, the State of New York was

the appropriate entity to substitute following the death of defendant Williams. *Id.; see also, e.g., Parra v. Wright,* No. 11–CV–6270, 2011 WL 3608475, at \*3 (W.D.N.Y. Aug. 10, 2011). Although defendant argues that the court did not have jurisdiction to make that substitution, it candidly acknowledges the absence of any legal authority to support its position. Def.'s Memo. of Law (Dkt. No. 29–1) at 5. Rather, defendant simply states that, "[f]or the same reason the Court lacked the jurisdiction to substitute Williams' with his successor, the Court lacks jurisdiction to substitute Williams with the State of New York."*Id.*

Having carefully considered defendant's argument, and conducting my own research on the issue, I find there is no merit to its argument. Because a claim under the ADA and section 504 may be commenced against the public entity responsible for the alleged acts, plaintiff could have commenced this action against the State of New York from its inception. Instead, plaintiff opted to commence the action against a public official, Mr. Williams. Compl. (Dkt. No. 1). For the sake of judicial efficiency, and in its inherent authority to manage its docket, the court *sua sponte* substituted the State of New York, instead of, for example, issuing an order directing plaintiff to amend his complaint to name the State of New York as defendant. The court's authority to issue such a directive is well supported. *See, e.g., Zuk v. Gonzalez,* No. 07–CV–0732, 2007 WL 2163186, at \*2 (N.D.N.Y. July 26, 2007) (Scullin, J.) ("[T]o the extent that Plaintiff has named the individual Defendants in their official capacities, he has in essence named Onondaga County ... as a Defendant. Construing Plaintiff's complaint liberally in light of his *pro se* status, and in the interest of judicial economy, the Court will *sua sponte* substitute Onondaga County as the sole Defendant in place of the individually named defendants."(internal citations omitted)); *Dockery v. Tucker,* No. 97–CV3584, 2006 WL 5893295, at \*7 (E.D.N.Y. Sept. 6, 2006) (adding the United States as a defendant, *sua sponte,* in a Federal Tort Claims Act claim brought by a *pro se* plaintiff); *Ciancio v. Gorski,* No. 98–CV–0714, 1999 WL 222603, at \*1 (W.D.N.Y. Apr. 14, 1999) (substituting, *sua sponte* and "in the interest of eliminating undue complication without affecting the substantial rights of the parties," the County of Erie as a defendant where it was unclear that the plaintiff could sue an individual in his official capacity under Title VII but well established that the county was a proper defendant). [2] Accordingly, I recommend that defendant's motion to dismiss plaintiff's complaint be denied.

**2**
    All unreported decisions have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

## IV. *SUMMARY AND RECOMMENDATION*

**\*3**  Plaintiff's complaint originally asserted claims under the ADA and section 504 against six individual defendants. Following the dismissal of five of those defendants, and learning that the sixth defendant is deceased, Judge Mordue substituted the State of New York as the sole defendant. His authority to *sua sponte* make that substitution in the interest of judicial efficiency, and in light of plaintiff's *pro se* status, is well supported. For these reasons, it is hereby respectfully

RECOMMENDED that defendant's motion to dismiss for failure to state a claim (Dkt. No. 29) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), (d); Fed.R.Civ.P. 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of this court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Slip Copy, 2013 WL 4008881

---

**End of Document**       © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 1732006
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Scott W. LASHER, Plaintiff,

v.

THE CITY OF SCHENECTADY, Edward
Ritz, Kenneth Hill, Dan Kane, Yoni Moskow,
Robert W. Glasser, Individually and as Agents,
Servants, and/or Employees and Police Officers
of the City of Schenectady and the City of
Schenectady Police Department Defendants.

No. 02–CV–1395.
|
Aug. 3, 2004.

**Attorneys and Law Firms**

Castillo & Associates, Albany, NY, for Plaintiff, Gaspar M.
Castillo, Jr., of counsel.

The Tuttle Law Firm, Latham, New York, for Defendant Hill,
James B. Tuttle, of counsel.

Carter, Conboy Law Firm, Albany, NY, for Defendants City
of Schenectady, Ritz, Kane, Mozkow, and Glasser, Louis U.
Gasparini, of counsel.

*MEMORANDUM—DECISION and ORDER*

MCAVOY, Senior J.

**I. INTRODUCTION**

**\*1** Plaintiff Scott W. Lasher ("Plaintiff") commenced the
instant action pursuant to 42 U.S.C. §§ 1983 and 1988,
asserting claims of excessive force, false arrest, unlawful
imprisonment, malicious abuse of process, denial of prompt
medical care, assault and battery, and violations of his Fourth
and Fourteenth Amendment rights, arising out of his arrest
on January 20, 2002. Presently before the Court are motions
for summary judgment submitted pursuant to FED. R. CIV.
P. 56 by Defendant Kenneth Hill and Defendants City of
Schenectady, Edward Ritz, Dan Kane, Yoni Moskow, and
Robert W. Glasser seeking dismissal of the Complaint in its
entirety.

**II. FACTS**

On January 20, 2002, Plaintiff and Damien Schon ("Schon")
were at a bar in downtown Schenectady. Also present at the
bar were Defendants Kenneth Hill ("Hill") and Edward Ritz
("Ritz"). At all times relevant hereto, Hill and Ritz were off-
duty, non-uniformed police officers for the Defendant City
of Schenectady ("the City"). While at the bar, Plaintiff and
Ritz consumed alcohol. Hill stated that he may have drank
alcoholic beverages, but does not recall what he consumed.

Plaintiff and Schon left the bar when it closed at 4:00 a.m.
They entered Plaintiff's Honda sport utility vehicle, drove out
of the parking lot and proceeded past the bar. At the same
time, Hill and Ritz also left the bar and entered Hill's vehicle.
As they began to exit the parking lot, Michael Parisi, the bar
owner, ran towards them. He told Hill and Ritz that a gunshot
emerged from a vehicle as it passed by the bar. Parisi pointed
to Plaintiff's passing vehicle as the source of the shot. [1] Hill
and Ritz then exited the lot and began to follow Plaintiff's
vehicle.

[1]     Plaintiff contends that as his vehicle passed the bar,
        Schon threw a billiard ball from the passenger's side. He
        asserts that the sound of the ball hitting the bar's outside
        wall was mistaken for a gunshot. There is no dispute,
        however, that Parisi reported a gunshot.

Parisi also reported the incident by telephone to the
Schenectady Police Department, describing the vehicle as a
red Blazer (sports utility vehicle). An employee of the bar also
called in a report that a "drive-by" shooting had occurred and
identified the vehicle as a red Blazer or red Rodeo.

After being followed for several blocks, Plaintiff stopped
his vehicle at an intersection near Schenectady Police
Department Headquarters. Hill stopped four to five car
lengths behind Plaintiff and remained in his vehicle with Ritz.
Plaintiff and Schon then exited their vehicle. Plaintiff put
his hand in his jacket in a manner indicating that he had a
weapon. [2] Plaintiff and Schon then returned to their vehicle
and drove away. Hill ran into the police station to report the
incident. Ritz moved into the driver's seat of Hill's vehicle and
continued to follow Plaintiff's vehicle. He eventually stopped
to use a pay phone to contact police dispatch. After five to
ten minutes at the police station, Hill learned that Plaintiff's
vehicle had been located. He and Officer Thomas Kelly left
to go to the scene.

2   Plaintiff contends that because he was unaware that the individuals who were following him were police officers, he feared their intentions and tried to scare them away by pretending to have a weapon. Hill and Ritz contend that they saw two muzzle flashes from gunshots, prompting Hill to accelerate his vehicle in reverse.

At approximately 4:45 a.m., uniformed officers apprehended Plaintiff and Schon as they were walking on a sidewalk. Officer Thomas Harrigan ("Harrigan") instructed Plaintiff to get down on the ground. Harrigan then handcuffed Plaintiff and helped him to stand up. [3] Next, Harrigan and Defendant Schenectady Police Officer Dan Kane ("Kane") escorted Plaintiff to a police car operated by Officer Phillip Feldhaus ("Feldhaus") and Defendant Schenectady Police Officer Yoni Moskow ("Moskow"). Plaintiff asserts that on the way to the car, a non-uniformed man approached him, asked "[r]emember me?", and then punched him in the face, causing him to bleed profusely. Plaintiff was then seated in the police car where his nose continued to bleed. No ambulance was called to the scene.

3   Harrigan does not recall seeing blood or injury to Plaintiff after Plaintiff stood up.

**\*2** Officers Hill and Ritz were the only persons employed by the City of Schenectady Police Department who were not in uniform on the night in question and who were present at some point in time at the location where Plaintiff was arrested. Hill contends that when he arrived at the scene with Officer Kelly, Sergeant Peters asked him to identify Plaintiff and advised him that Plaintiff was in the back of a police car. Hill states that he walked to the police car operated by Feldhaus and Moskow and identified Plaintiff. Feldhaus and Moskow state that they never saw Hill approach the car.

Ritz asserts that he stayed at the location of the payphone until uniformed officers arrived and reported the arrest. He states that he then drove Hill's vehicle to the scene and remained in the vehicle while he identified Plaintiff. He contends he did not exit the vehicle at any time while Plaintiff was handcuffed.

Plaintiff, who stands 5′11″, states that the man who punched him was taller than he. According to a Schenectady Police Department Personal Information Sheet, Ritz is 5′8″ tall. Hill states that he is 5′10″ tall, however at a deposition held in a previous action, he testified that he was 6′ tall. At the time Plaintiff was punched, he was not walking at his full height,

but was "bent over" from the handcuffs connecting his wrists from the rear.

At approximately 5:06 a.m., Feldhaus and Moskow left with Plaintiff in custody. Paramedics with the Schenectady Fire Department arrived at the police station to treat Plaintiff's injuries at 6:37 a.m. At 4:10 p.m., after he had been released from custody, Plaintiff received treatment for his injuries at the hospital. His medical records indicate that he suffered a "nasal fracture with deformity and obstruction."Plaintiff also complained of a chipped lower front tooth and wrist pain.

Plaintiff was eventually charged by Defendant Robert W. Glasser ("Glasser"), a detective with the Schenectady City Police Department, for violating New York Penal Law § 120.20, reckless endangerment in the second degree, for attempting to assault Hill and Ritz with a handgun. The matter was adjourned in contemplation of dismissal pursuant to N.Y. CRIM. PROC. § 170.55 (McKinney 2004).

Plaintiff commenced the instant action contending that Defendants violated his constitutional rights under the Fourth and Fourteenth Amendments and that he was subject to excessive force, false arrest, unlawful imprisonment, malicious abuse of process, denial of prompt medical care, and assault and battery. Defendants now move to dismiss the Complaint in its entirety pursuant to FED. R. CIV. P. 56.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In applying this standard, courts must " 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001) (quoting *Cifra v. General Electric Co.,* 252 F .3d 205, 216 (2d Cir.2001)). Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted). Rather, the nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown,* 257

F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

## IV. DISCUSSION

### a. False Arrest, Unlawful Search and Seizure, Malicious Abuse of Process, and Unlawful Imprisonment

**\*3** Plaintiff asserts claims for false arrest, unlawful search and seizure, malicious abuse of process, and unlawful imprisonment. The existence of probable cause is a complete defense to each of these claims. *See Weyant v. Okst,* 101 F.3d 845, 852–53 (2d Cir.1996) (false arrest under New York State and federal law, unlawful search and seizure, unlawful imprisonment); *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994) (malicious abuse of process); *Berman v. Silver, Forrester, & Schisano,* 156 A.D.2d 624, 625 (2d Dep't 1989).

Whether probable cause exists is based upon the totality of the circumstances. *Marshall v. Sullivan,* 105 F.3d 47, 54 (2d Cir.1996) (citing *Illinois v. Gates,* 462 U.S. 213, 231–33 (1983)). It exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Provost v.. City of Newburgh,* 262 F.3d 146, 157 (2d Cir.2001). "It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miroslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd* 993 F.2d 1534 (2d Cir.1993)). Probable cause can also exist "even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citing *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (N.Y.1983)).

In the present case, Hill and Ritz had probable cause to believe that Plaintiff committed a crime. As they were leaving the parking lot at the bar, bar owner Michael Parisi ran towards them and reported that a gunshot had been fired from a passing vehicle. Parisi identified Plaintiff's vehicle as the source of the gunshot. Plaintiff contends that Schon threw a billiard ball from Plaintiff's vehicle, and that Parisi mistook

the sound of the ball striking an outside wall of the bar for the sound of a gunshot. However, even if Parisi gave Hill and Ritz mistaken information, there is no evidence that they had any reason to believe that Parisi's report was mistaken or erroneous. Thus, because Parisi's information would lead a person of reasonable caution to believe that a gunshot emerged from Plaintiff's vehicle, Hill and Ritz had probable cause to believe that Plaintiff committed a crime.

In addition, the uniformed police officers, namely Kane and Moskow, had probable cause to arrest Plaintiff. Two phone calls were received by the Schenectady Police Department indicating that gunshots had been fired at the bar. The police department also received a description of a vehicle similar to Plaintiff's as a source of the shots. In addition, when Hill ran into Schenectady Police Headquarters, he reported that he saw "two muzzle flashes" after Plaintiff emerged from his vehicle and reached into his jacket in a manner indicating that he had a weapon. Because the totality of information available to Kane and Moskow would lead a person of reasonable caution to believe that Plaintiff had committed a crime, Kane and Moskow had probable cause to arrest Plaintiff.

**\*4** Plaintiff contends that probable cause was lacking because both Hill's statement and a similar statement made by Ritz were false. However, Plaintiff has submitted no evidence suggesting that the uniformed officers had reason to doubt the truthfulness of Hill's or Ritz's account of gunshots being fired at Hill's vehicle or the other reports of a gunshot at the bar. Thus, Kane and Moskow were permitted to rely on these reports.

Finally, Plaintiff concedes that Glasser had probable cause to issue criminal process against Plaintiff. Glasser, relying on the statements of Hill and Ritz, charged Plaintiff with violating New York Penal Law § 120.20, reckless endangerment in the second degree, for attempting to assault Hill and Ritz with a handgun. Even if the statements of Hill and Ritz were false, Plaintiff admits that there is no evidence that Glasser believed them to be false at the time that he filed the charge. Thus, Glasser had probable cause to file the charge against Plaintiff.

For the foregoing reasons, Plaintiff's claims for false arrest, malicious abuse of process, and unlawful imprisonment are dismissed.

### b. Deliberate Indifference to Serious Medical Needs

Plaintiff also claims that Defendants denied him prompt medical care. Claims raised by pre-trial detainees alleging inadequate or untimely medical attention are to be analyzed under the Due Process Clause of the Fourteenth Amendment. *See Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). The "standard for analyzing a pre-trial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard [afforded to inmates]." *Bourdon v. Roney,* No. 9:99–CV–0769, 2003 WL 21058177, *10 (N.D.N .Y. March 6, 2003) (citing *Revere,* 463 U.S. at 244). To survive summary judgment, Plaintiff must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 98, 106 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513, U.S. 1154 (1995); *Davidson v. Harris,* 960 F.Supp. 644, 646 (W.D.N.Y.1997).

The deliberate indifference standard embodies both an objective and a subjective prong. *Hathaway,* 37 F.3d at 66. First, the injury must be, in objective terms, "sufficiently serious." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). Second, the charged official must act with a sufficiently culpable state of mind. *Id.*

### 1. *Serious Medical Need*

A serious medical need exists when "the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v.. Peters,* 111 F.3d 1364, 1373 (7 th Cir.1997)). Conditions that qualify as serious are those of "urgency" that may result in "degeneration" or "extreme pain." *Hathaway,* 37 F.3d at 66. Among the relevant factors in what is a fact-intensive inquiry are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9 th Cir.1992)).

 **\*5** Here, there is evidence that Plaintiff's nose was broken and was bleeding profusely. In addition, Plaintiff complained that he had a chipped tooth and bruised wrists. Some courts have held that injuries similar to Plaintiff's are insufficient to constitute a serious medical need. *See,e.g.,Kaup v. DeTella,* No. 98 C 4814, 1999 WL 286288, at *4 (N.D.Ill.1999) (holding that the plaintiff failed to sufficiently identify a

serious medical need because he alleged only a broken nose and chipped teeth); *Gibson v.. Borough of West Chester,* No. Civ. A. 02–9089, 2004 WL 203175, at *7 (E.D.Pa. Jan. 12, 2004) (finding that the plaintiff was not in such physical distress as to require emergency medical care after being punched in the face and sustaining a broken and bloody nose); *Wesson v. Oglesby,* 910 F.2d 278, 284 (5 th Cir.1990) (holding that an inmate's swollen and bleeding wrists from handcuffing did not constitute serious medical need).

However, in this case, the evidence of the severity and duration of Plaintiff's nose bleed does not preclude a conclusion that his condition was sufficiently serious. Plaintiff's injury was sustained sometime between 4:45 a.m., when he was apprehended by the officers, and 5:06 a.m., when he was taken from the scene to the police station. Plaintiff states that his nose was bleeding profusely from the time he was punched until well after he was in the police station. Ronald Maslanka, a lieutenant and paramedic with the Schenectady Fire Department, examined Plaintiff at the police station at 6:52 a.m. At that time, he observed that Plaintiff had dried blood around the opening of his nose. Thus, it could be reasonably concluded that Plaintiff's nose was bleeding for approximately two hours. Courts have found similar conditions of profuse bleeding to be actionable. *See Aldridge v. Montgomery,* 753 F.2d 970, 972–73 (11 th Cir.1985) (one-and-a-half-inch cut over detainee's eye that was bleeding profusely for two and a half hours was a serious medical need); *Maxy v. Larson,* No. 03–C–623–C, 2004 WL 253350, at *3 (W.D.Wis. Feb. 5, 2004) (lacerations on the plaintiff's head and severe bleeding constituted a serious medical need). Thus, Plaintiff has raised a triable issue of fact as to whether his condition was sufficiently serious.

### 2. *Deliberate Indifference*

"Deliberate indifference is shown ... by failure to provide prompt attention to the medical needs of a pre-trial detainee." *Estelle,* 429 U.S. at 105. Delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims. *Gutierrez,* 111 F.3d at 1371. A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference. *Brown v. Hughes,* 894 F.2d 1533, 1538 (11 th Cir.1990).

As previously shown, it could reasonably be concluded that Plaintiff's bloody nose was left untreated for approximately two hours. Courts have found that delays of a few hours

in treating injuries involving profuse bleeding sufficiently demonstrate deliberate indifference. *See Aldridge,* 753 F.2d at 972 (one-and-a-half-inch cut over detainee's eye that was bleeding for two and a half hours was an actionable delay); *Baker v. Dist. of Columbia,* No. 2:01CV472, 2002 WL 32539618, at *6 (E.D.Va.2002) (one-hour delay was reasonable in treating plaintiff's leg injury because plaintiff was not bleeding or in shock and no bones were broken). Thus, triers of fact could reasonably conclude that Defendants acted with deliberate indifference.

**\*6** For the foregoing reasons, Plaintiff has raised triable issues of fact as to whether Defendants acted with deliberate indifference to a serious medical need.

### c. Excessive Force

Plaintiff also claims that he was subjected to the excessive use of force. To establish a claim of excessive force, Plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, "objectively unreasonable" under Fourth Amendment standards. *Graham v. Connor,* 490 U.S. 386, 395 (1989); *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). The United States Supreme Court elaborated,

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.

*Graham,* 490 U.S. at 396–97. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene. *Id.* at 396. Factors to consider include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Finnegan,* 915 F.3d at 823.

There is sufficient evidence in the record from which a fair-minded trier of fact could reasonably conclude that the use of force against Plaintiff was excessive. Plaintiff states that at the moment he was handcuffed on the ground, he had no physical injuries. He also states that he was lifted from the ground to his feet without incident. This is corroborated

by Harrigan, who stated that he saw no blood or injury to Plaintiff when he stood up after being handcuffed. Kane and Harrigan then began to lead Plaintiff to a police car. There is no evidence that, at this point, the circumstances could be categorized as "tense," "uncertain," or "rapidly evolving." *See Graham,* 490 U.S. at 396–97. Indeed, there is evidence in the record that Plaintiff was handcuffed, posed no physical threat to those surrounding him, and was not resisting arrest. However, it was under these circumstances that Plaintiff states that a non-uniformed man approached and punched him in the face. Such circumstances would not require a split-second judgment to use force against Plaintiff. Thus, there is sufficient evidence from which it could be concluded that Plaintiff was subjected to the excessive use of force. *See, e.g., Newland v. Achute,* 932 F.Supp. 529, 534 (S.D.N.Y.1996) (holding that it could reasonably be concluded that the defendants used excessive force against plaintiff who was assaulted by prison guards while he was handcuffed).

### 1. *Direct Participation*

It is well-settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991). A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so. *See Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

**\*7** Reasonable jurors could conclude that Hill was a direct participant in the excessive use of force against Plaintiff. Plaintiff admits that he cannot say with certainty which particular officer punched him. However, under the facts and circumstances of this case, Plaintiff need not establish who, among the group of officers, directly participated in the attack because there is sufficient circumstantial evidence from which the trier of fact could make reasonable conclusions concerning who, if anyone, struck Plaintiff. *See Skorupski v. County of Suffolk,* 652 F.Supp. 690, 694 (E.D.N.Y.1987) (rejecting defendants' argument that they were entitled to summary judgment because plaintiff cannot specify which of the officers struck him and finding that all of the officers were potentially liable because they had an affirmative duty to intervene).

Plaintiff states that he was being escorted to a police car by Harrigan and Kane when a non-uniformed man approached him, asked "[r]emember me?", and then punched him in the face. The question "[r]emember me?" indicates that the non-uniformed man saw Plaintiff prior to his arrest. In addition, it could reasonably be concluded that the non-uniformed man was a police officer because there is no evidence that anyone else was at the scene or that Harrigan and Kane tried to prevent anyone from reaching Plaintiff. A trier of fact could reasonably conclude that Harrigan and Kane would not have reason to try to keep fellow officers away from Plaintiff. Moreover, neither Hill nor Ritz was wearing a uniform that evening; both had seen Plaintiff in a previous encounter that evening; and both were at the scene sometime after Plaintiff was handcuffed.

It is uncontested that while Ritz was at the scene, he did not exit his vehicle at any time while Plaintiff was handcuffed. Hill states that while he was at the scene, the only time he saw Plaintiff was when he identified him sitting in back of the police car operated by Feldhaus and Maskow. However, Feldhaus and Moskow indicate that they never saw Hill approach the car.

Plaintiff also states that the man who punched him was taller than he. According to personnel data, Ritz stands 5′8″ tall. Hill states that he is 5′ 10″ tall, however he testified in a previous action that he was 6′ tall. Plaintiff stands 5′11″. As a result of being handcuffed, he was walking in a "bent over" manner at the time he was punched. It would be reasonable to conclude that under Plaintiff's circumstances, a man who stands 5′10″ to 6′ tall would appear taller than him.

Based on the foregoing, a fair minded trier of fact could reasonably conclude that Hill used excessive force against Plaintiff.

### 2. *Failure to Intercede*

An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, *see* *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988); (2) that a citizen has been unjustifiably arrested, *see* *Gagnon v. Ball,* 696 F.2d 17, 21 (2d Cir.1982); or (3) that any constitutional violation has been committed by a law enforcement official, *see* *O'Neill,* 839 F.2d at 11. For liability to attach, there must have been a realistic opportunity to intervene to prevent harm from occurring. *See* *id.* at 11–

12.Whether an officer had sufficient time to intercede or was capable of preventing the harm being used by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise. *Id.*

**\*8** Plaintiff states that the uniformed officers, presumably Defendants Kane and Moskow, did not try to protect him by stepping between him and the non-uniformed man. Plaintiff further claims that the uniformed officers held him while the non-uniformed man punched him. Defendants contend that they did not have a realistic opportunity to prevent the incident. Indeed, the single punch may have occurred without warning, providing no time for the uniformed officers to prevent it. *See,e.g.,id.* at 11 (holding that a police officer had "no realistic opportunity" to react when the plaintiff was struck by three blows in rapid succession). However, there is a triable issue of fact as to whether the uniformed officers held Plaintiff so that he could be punched or whether they had an insufficient opportunity to react to an unexpected punch.[4]

> 4   Because it is uncontested that Defendant Ritz did not exit his vehicle at any time while Plaintiff was handcuffed, he could not have participated in holding Plaintiff during the punch. Also, a fair minded trier of fact could only reasonably conclude that Ritz, who was seated in his vehicle, did not have a sufficient opportunity to react to an unexpected punch. Therefore, Plaintiff's claim of excessive force against Ritz is dismissed.

### d. Equal Protection

Plaintiff's complaint also asserts an equal protection violation. The equal protection clause of the Fourteenth Amendment directs state actors to treat similarly situated people alike. *Delisser v. Goord,* No. Civ. 9:02cv00073, 2003 WL 133271, at *6 n.8 (N.D.N.Y. Jan. 15, 2003) (citing *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985))."To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class."*Id.* (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)). Here, Plaintiff offers no evidence that he was treated differently than similarly situated persons. Thus, his equal protection claim is dismissed.

### e. Qualified Immunity

Defendants next claim that they are entitled to qualified immunity. As the Second Circuit has explained:

We conduct a two part inquiry to determine if an official is entitled to qualified immunity. The threshold question is whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier [v. Katz],* 533 U.S. [194, 201], 121 S.Ct. 2151 [ ( 2001) ]. Addressing this initial question serves the important role of providing a clear standard against which officers can measure the legality of future conduct.... Thus, although we have under certain circumstances bypassed this first step and proceeded directly to the qualified immunity inquiry, that is the exception rather than the rule....

If we determine that the officer's conduct did not violate a constitutional right, we proceed no further and hold that the officer is entitled to qualified immunity. *See Saucier,* 533 U.S. at 201. However, if we decide otherwise, we proceed to "ask whether the right was clearly established" at the time it was allegedly infringed. *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151....

**\*9** Said differently, if the officer's conduct violated a right, we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions.... If the officer reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken.... However, if his belief was not objectively reasonable, qualified immunity offers him no solace and the plaintiff's claims must be allowed to proceed. *See Harlow [v. Fitzgerald],* 457 U.S. [800, 818–819 (1982)* ].

*Loria v. Gorman,* 306 F.3d 1271, 1281 (2d Cir.2002).

### 1. *Glasser's and Ritz's Entitlement to Qualified Immunity*

Because Glasser and Ritz did not violate Plaintiff's Fourth Amendment rights, they are entitled to qualified immunity. Indeed, Glasser had probable cause to issue criminal process against Plaintiff and Ritz had probable cause to believe that Plaintiff committed a crime. Even assuming there was a constitutional violation, reasonable officers could disagree whether there was probable cause and Defendants Glasser and Ritz, therefore, are entitled to qualified immunity as to all of Plaintiff's claims. *See Saucier,* 533 U.S. at 201.

### 2. *Hill's Entitlement to Qualified Immunity*

It is clearly established that pre-trial detainees have the right to be free from excessive force. As previously discussed, it could be reasonably concluded that Plaintiff's Fourth Amendment freedom from the use of excessive force was violated. Thus, the inquiry becomes whether the officers' belief in the lawfulness of their actions was reasonable. The facts alleged, taken in the light most favorable to Plaintiff, demonstrate that Hill used excessive force against Plaintiff. There is evidence from which it could reasonably be concluded that Plaintiff was struck without any purpose other than to inflict pain or cause injury to him. If true, such actions would be unreasonable and no fair minded trier of fact could conclude otherwise. *See Graham,* 490 U.S. at 396. Thus, Defendant Hill is not entitled to summary judgment on the issue of qualified immunity as to the claim of excessive force.

### 3. *Kane's and Moskow's Entitlement to Qualified Immunity*

Also as previously shown, there are triable issues of fact as to whether Defendants Kane and Moskow had a reasonable opportunity to protect Plaintiff from the use of force. If Kane and Moskow were holding Plaintiff in place while he was punched, any belief in the lawfulness of their action would be unreasonable. Thus, Defendants Kane and Moskow are not entitled to summary judgment on the issue of qualified immunity as to the claim of excessive force.

### f. **Municipal Liability Under § 1983**

Plaintiff claims that the City established an unwritten custom of ratifying and authorizing unconstitutional actions of its employees. *See Hogan v. Franco,* 896 F.Supp. 1313, 1319 (N.D.N.Y.1995) (the existence of the policy or custom does not need to be evidenced by a writing); *Poulsen v. City of North Tonawanda,* 811 F.Supp. 884, 896 (W.D.N.Y.1993) ("[a] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials."). Specifically, Plaintiff claims that the City failed to properly train and supervise its officers. He asserts that the City of Schenectady Police Department established the customs or practices of utilizing excessive force in arrests and failing to investigate internal affairs complaints against officers involved in unconstitutional conduct. [5]

[5] Plaintiff asserts several other grounds for municipal liability by listing histories of other alleged unconstitutional actions by City police officers.

However, either the actions are not similar to the actions of the Defendant officers which reasonable factfinders could conclude to be unconstitutional or they do not exemplify constitutional violations.

**\*10** When subordinate municipal officials are alleged to have committed a constitutional violation, municipal liability turns on the plaintiff's ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority. *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir.2004). One method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of the subordinates' unconstitutional actions and consciously chose to ignore them, effectively ratifying the actions. *Id.* Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a "deliberate choice," that acquiescence may "be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989) (citations omitted); *see also Jeffes v. Barnes,* 208 F.3d 49, 63 (2d Cir.2000); *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995).

To prove "deliberate indifference," a plaintiff must demonstrate that (1) "a policymaker knows 'to a moral certainty' that [his or] her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; [6] and (3) "the wrong choice by the [municipality] employee will frequently cause the deprivation of a citizen's constitutional rights. *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992) (internal quotations and citations omitted). Because the failure to properly train theory and the failure to properly supervise theory emphasize different facts and require different showings in order to establish the official's deliberate indifference, they must be analyzed independently. *Amnesty America,* 361 F.3d at 127.

[6]     If there is a history of police officers using excessive force against citizens, the municipality may then be required to train officers not to engage in this type of activity, since the test requires a choice that is either difficult or frequently mishandled.

### 1. *Failure to Properly Train*

A municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding

the risk that its employees will unconstitutionally apply its policies without more training. *City of Canton,* 489 U.S. at 387–90. Plaintiff must identify a specific deficiency in the city's training program and establish that the deficiency caused a deprivation of his constitutional rights. *Id.* at 391.Such evidence is necessary to show that "the officer's shortcomings ... resulted from ... a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances. *Id.* at 390–91.

In the present case, Plaintiff has proffered no evidence of the City's training program or advanced any theory as to how a training deficiency caused a deprivation of his rights. He only concludes that the City failed to train its officers not to engage in certain unconstitutional acts. Plaintiff offers as evidence a list of prior felony convictions of City police officers, sworn testimony regarding the behavior of City police officers, and case law in which City police officers were found liable for civil rights violations. However, the factfinder's inferences of inadequate training and causation must be based on more than the mere fact that misconduct occurred in the first place. *City of Canton,* 489 U.S. at 390–92. "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983."*Id.* Plaintiff has provided no evidence as to whether the City trained its officers between the cited incidents, how the training was conducted, or how better or different training could have prevented his injury. *See Amnesty America,* 361 F.3d at 130. Neither has Plaintiff provided evidence tending to rule out those causes of his injury that would not support municipal liability, such as the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training. *See id; City of Canton,* 489 U.S. at 390–91. Therefore, no reasonable trier could conclude that the City failed to properly train its officers as Plaintiff alleges.

### 2. *Failure to Properly Supervise*

**\*11** In the context of a failure to supervise case, deliberate indifference may be established by showing that policymaking officials deliberately ignored an obvious need for supervision. *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents. *Id.* When it is claimed that a municipality negligently supervised its officers in their use of force, the evidence that a number of claims of police brutality has been made by other persons

against the city, together with evidence as to the City's treatment of these claims, is relevant. *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 328 (2d Cir.1986).

In the present case, Plaintiff has presented triable issues of fact as to whether the City failed to properly supervise its officers. Plaintiff cites the prior civil rights actions of *John C. Rodick v. City of Schenectady, et. al.,* No. 90–cv–0937 (N.D.N.Y.), and *DiSorbo, et. al. v. City of Schenectady, et. al.,* No. 99–cv–1131 (N.D.N.Y.), in which it was found that City officers used excessive force against citizens. Specifically, in *DiSorbo,* a jury found that Defendant Hill failed to intervene during another officer's use of excessive force even though he ultimately was found to be entitled to qualified immunity. *See DiSorbo v. Hoy,* 343 F.3d 172, 180 (2d Cir.2003). As previously discussed, it could also be concluded that the Defendant officers engaged in similar conduct during Plaintiff's arrest. Thus, Plaintiff has presented sufficient evidence to support the conclusion that there was a recent history of City officers using excessive force.

In addition, it could also be concluded that City officials were aware of repeated incidents of officer misconduct and deliberately failed to take any remedial steps. The claims of excessive force against City police officers in *Rodick* and *DiSorbo* were commenced in 1990 and 1999, respectively. This supports a conclusion that the City had notice that its officers were using excessive force well before the events in the present case. However, in *DiSorbo,* the plaintiff presented evidence from *Rodick* which showed that the City took no disciplinary action against officers who used excessive force. *See Hoy,* 343 F.3d at 181. Moreover, Plaintiff provides circumstantial evidence that ranking members of the City police department had notice of incidents of officer misconduct and consciously chose not to take any disciplinary action. Former Schenectady Police Department internal affairs officer Eric Yager stated in an affidavit that he informed Schenectady Police Department Chief Gregory Kaczmarek that some patrol division officers were entering

into investigations without proper training, that the officers were not following proper procedures and policies, and that the officers were acting in an illegal manner towards citizens. Yager stated that Kaczmarek did not believe the information and refused to open an investigation. Furthermore, former Schenectady Police Department internal affairs officer Daniel Johnson stated that the chief requested that complaints regarding certain officers be referred to assistant chiefs, but not to Johnson, for investigation. Taking this evidence in the light most favorable Plaintiff, a fair minded trier of fact could reasonably conclude that the City had notice that its officers engaged in illegal activities with citizens, including the excessive use of force, but exhibited deliberate indifference by declining to properly investigate or impose disciplinary measures.

**V. CONCLUSION**

**\*12** For the foregoing reasons, Defendants Ritz, Kane, Moskow, Glasser, and City of Schenectady's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's claims of false arrest, unlawful search and seizure, malicious abuse of process, unlawful imprisonment, equal protection, and failure to properly train are DISMISSED as to those Defendants. Plaintiff's claim of excessive force is dismissed only as to Defendants Ritz and Glasser. Defendant Hill's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's claims of false arrest, unlawful search and seizure, malicious abuse of process, unlawful imprisonment, and equal protection are DISMISSED as to Defendant Hill. In all other respects, Defendants' motions are DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1732006

---

2014 WL 3695488
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Justin MUNLYN, Plaintiff,
v.
Correction Officer PIETRIE, Correction
Officer Koon, Correction Officer Newark,
Dr. Adams, Upstate Corr. Fac. 11 Bldg, RN
Wilson, Upstate Corr. Fac. 11 Bldg, Nurse John
Doe, Upstate Corr. Fac. 11 Bldg, Defendants.

No. 13–CV–6170FPG.
|
Signed July 24, 2014.

**Attorneys and Law Firms**

Justin Munlyn, Attica, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office, Rochester, NY, for Defendants.

**DECISION AND ORDER**

FRANK P. GERACI, JR., District Judge.

## I. INTRODUCTION

**\*1** *Pro se* Plaintiff Justin Munlyn ("Plaintiff"), an inmate in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), filed a Complaint on March 29, 2013 against Defendants CORRECTION OFFICER PIETRIE ("CO.Pietrie"); CORRECTION OFFICER KOON ("C.O.Koon"); CORRECTION OFFICER NEWARK ("CO.Newark"); DR. ADAMS ("Dr.Adams"), Upstate Corr. Fac. 11 Bldg; RN WILSON ("RN Wilson"), Upstate Corr. Fac. 11 Bldg; and NURSE JOHN DOE ("Nurse Doe"), Upstate Corr. Fac. 11 Bldg, pursuant to 42 U.S.C. § 1983, alleging as the constitutional bases for his claim cruel and unusual punishment in violation of the Eighth Amendment and a violation of the Equal Protection Clause of the Fourteenth Amendment. ECF No. 1. The Complaint also shows Plaintiff checked the following grounds for his § 1983 action: "Equal Protection," "Excessive Force," "Failure to Protect," and "Denial of Medical Treatment." *Id.* at 5.

Defendants have filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting Plaintiffs failure to state a claim upon which relief can be granted (ECF No. 10), and Plaintiff has submitted his Memorandum in Opposition to the Motion to Dismiss (ECF No. 15). [1] Upon review of this matter, including to the extent that Plaintiff alleged the checked claims, and for the reasons set forth herein below, the Defendants' motion to dismiss the Complaint is hereby granted.

[1]      On December 31, 2013, this Court entered an Order denying Plaintiff's Notice of Motion seeking "an extension to prepare a request for discovery and a motion to compel of interrogatories."ECF No. 17. Subsequently, due to the pendency of Defendants' Motion to Dismiss and Plaintiff's timely filed response thereto, the Court denied Plaintiff's request for discovery pursuant to Fed.R.Civ.P. 12(b) and *Applewhite v. Sheahan,* No. 08–CV–6045–CJS, at *5, 2013 WL 144957 (W.D.N.Y. January 11, 2013). ECF No. 19.

## II. FACTUAL BACKGROUND

The Complaint sets forth two separate claims. The following allegations comprise the first claim (ECF No. 1, p 6–8): On February 27, 2012, Plaintiff and other two inmates were transported from Five Points Correctional Facility ("Five Points") to court in Seneca County by C.O. Pietrie, C.O. Koon and C.O. Newark. Before being transported and after arriving at the Seneca County Court building, Plaintiff informed them that his leg braces were on incorrectly. Initially, Plaintiff was told to "Wait until we feel like changing them," and at the Seneca County Court his escort officer "checked them only with a[n] eyes view," and told Plaintiff to "sit down." After court, again, Plaintiff pleaded to change the direction of his leg irons, but no change was made. Their attention diverted by a female officer transporting another inmate and "neglecting their responsibilities," CO. Pietrie and CO. Koon directed Plaintiff, in full restraints, and another inmate to go down the stairs unattended. As Plaintiff proceeded to do so, the cuff on the leg iron poked him in the ankle and when he tried to regain his balance, the chain of the leg iron tripped his left foot causing him to fall on his back and slide with another inmate, who tried to help him, down a flight of stairs. Plaintiff, along with the other inmate, was transported by ambulance to Geneva Medical Center where Plaintiff was treated for injuries to his neck, back and right wrist, given pain medication by injection, a cushion neck brace, a wheel chair and a cane. Upon his return to Five Points, Plaintiff

was seen by a nurse who took his statement for his medical files. After complaining all night about his pain and making a written complaint about how he was treated, Plaintiff was transferred the next morning to Downstate Correctional Facility ("Downstate"), where Plaintiff was given everything ordered.

**\*2** The second claim (ECF No. 1, p 6, 9–11) alleges that from February 28, 2012 until May 23, 2012, Plaintiff, then an inmate at Upstate Correctional Facility ("Upstate"), sent many complaints requesting to be seen by the doctor for chronic neck, back and wrist pains. Nurse Doe, against whom Plaintiff had used the grievance procedure, stopped by his cell, but was disrespectful and denied all requests to see the doctor. Plaintiff was finally seen once by Dr. Adams who "has a long history of being unprofessional and negligent to inmates."Dr. Adams stated, "He could care less of my pains" and asked about "my asthma." At that time, Doctor Adams ordered officers to "forcefully" take Plaintiff's neck brace and walking cane, and upon Plaintiff's refusal and repeated statements that he was in pain, Dr. Adams denied him permission to see the Upstate physical therapist. According to Plaintiff, RN Wilson neglected all of Plaintiff's complaints and stated, "Stop lying your [sic] fine." "In result to negligence," Plaintiff was subsequently transferred to Clinton Correctional Facility where he was treated and provided pain medication and, thereafter, transferred to Auburn Correctional Facility where he is seeing a mental health specialist and receiving physical therapy to help relieve pain.

## III. DISCUSSION

### A. Legal Standard for Motion to Dismiss

A court deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "must accept as true all of the allegations contained in a complaint."*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. The determination regarding "whether a complaint states a plausible claim for relief ... [is]

a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.Under this plausibility standard, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

"[W]ell-pleaded factual allegations" permit a court to "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."*Id.* at 679.Although Plaintiff's factual allegations set forth in the Complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* at 678.If a plaintiff "ha[s] not nudged [his/her] claims across the line from conceivable to plausible, [his/her] complaint must be dismissed."*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)."In ruling on a motion pursuant to Fed.R.Civ.P. 12(b)(6), the duty of the court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."*DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 113 (2d Cir.2010).

**\*3** Where the complaint was filed *pro se,*"it must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests."*Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir., 2013) (citing *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011) (internal quotation marks omitted)). Notwithstanding this solicitous approach, a *pro se* complaint must state a plausible claim for relief. *See Harris v. Mills,* 572 F.3d 66, 73 (2d Cir.2009).

### B. 42 U.S.C. § 1983 Claims

Section 1983 does not itself create any substantive rights, but provides a means by which a person alleging a constitutional violation may bring a claim. [2] (*Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)) (Section 1983, itself, is not " 'a source of substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' ")). Thus, to state a claim under § 1983, a person must allege that a defendant acting under color of state law has deprived him of a right, privilege, or immunity guaranteed by the Constitution and laws of the United States. *See*42 U.S.C. § 1983. Here, Plaintiff alleges violations of his Eighth Amendment rights by excessive force, denial of medical treatment and failure to protect his safety, and violations of his Fourteenth Amendment right to equal protection under the law.

2    42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

## 1. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment," U.S. Const. amend. VIII, and this prohibition includes punishments that "involve the unnecessary and wanton infliction of pain."*Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Inmates "have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials,"*Romano v. Howarth,* 998 F.2d 101, 104 (2d Cir.1993) (*citing Estelle v. Gamble,* 429 U.S. at 104) (quoting *Gregg v. Georgia* 428 U.S. at 173).

### a. Excessive Force

To bring an excessive force claim under the Eighth Amendment, a plaintiff must allege both an objective element and a subjective element. *Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The objective element is "contextual and responsive to contemporary standards of decency" and requires a demonstration that 'the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."*Hudson v. McMillian,* 503 U.S. at 9–10. Thus, the Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ."*Id.* Consequently, not every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") Yet, "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated .... whether or not significant injury is evident."*Id.* at 9.

**\*4** The subjective component of an excessive force claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in view of the particular circumstances surrounding the challenged conduct. *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citing *Blyden v. Mancusi,* 186 F.3d at 262) (quoting *Wilson v. Setter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Whether conduct in an excessive force case was "wanton" turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. at 7;*see also Blyden v. Mancusi,* 186 F.3d at 262–63.

Assuming, as I must, that the factual allegations of the complaint are true and interpreting the Complaint to raise the strongest claims that it suggests, and to the extent that Plaintiff's allegations suggest an excessive force claim, I conclude that Plaintiff has failed to state a plausible claim under the Eighth Amendment. Read liberally, the Complaint merely alleges the leg irons were placed on improperly or incorrectly and reflects no allegations that any force whatsoever was used by the corrections officers in the placement of the leg irons, or that Plaintiff suffered harm or physical injury in the placement of the leg irons. Unlike in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994) (complaint alleged too tightly placed restraints, causing serious and permanent physical injury, were placed wantonly and maliciously in retaliation for being a litigious inmate), Plaintiff's allegations are insufficient to meet the objective standard, and absent from the Complaint are any allegations from which the necessary subjective component of "wantonness" may be gleaned. The allegations of excessive force set forth in this claim fail both prongs of the Eighth Amendment analysis. To the extent alleged, this claim is dismissed.

### b. Denial of Medical Treatment

Plaintiff also alleges as a constitutional basis for his § 1983 action the denial of medical treatment. ECF No. 1. Construing Plaintiffs allegations to suggest the strongest possible arguments, he is alleging a violation of the Eighth Amendment due to inadequate medical treatment or care by Upstate medical officials. To establish an Eighth Amendment claim for inadequate medical treatment or care, a plaintiff must prove that the defendant(s) acted with "deliberate indifference to [his] serious medical needs,"*Estelle v. Gamble,* 429 U.S. at 104, as distinguished from offering mere proof of "negligen[ce] in diagnosing or treating a medical

condition."*Id.* at 106;*see also Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

This deliberate indifference standard is comprised of objective and subjective components. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)."Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."*Id.* (internal quotation marks omitted). Assessment of this objective component requires a court to determine whether the inmate was actually deprived of adequate medical care, *i.e.,* in violation of the prison official's duty to provide reasonable care, *and* whether this inadequacy in medical care is sufficiently serious to have caused or will likely cause harm, if any, to the inmate. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (internal citations omitted).

**\*5** "The objective component of an Eighth Amendment claim is ... [necessarily] contextual and fact-specific, as such the serious medical need inquiry must be tailored to the specific circumstances of each case."*Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003) (internal citation and quotation marks omitted). Factors considered relevant in determining the existence of a serious medical condition include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."*Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A deprivation of medical treatment can occur by prisoner officials unnecessarily delaying or interrupting medical care. *See Smith v. Carpenter,* 316 F.3d at 185. When the prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court addresses its seriousness inquiry to "the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone."*Id.*

"Subjectively, the charged official must act with a sufficiently culpable state of mind,"*i.e.,* "something more than mere negligence," and "the equivalent of criminal recklessness." *Hathaway v. Coughlin,* 99 F.3d at 553. Thus, under the subjective component, an official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."*Chance v.

*Armstrong,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. at 837). No claim of deliberate indifference under the Eighth Amendment is stated by "mere allegations of negligent malpractice." *Estelle v. Gamble,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.").*Id.*

Courts have recognized that not every claim of inadequate medical treatment made by a prisoner states an Eighth Amendment violation. *See Salahuddin v. Goord,* 467 F.3d at 279. It has long been establish that an inmate's "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth amendment violation."*Chance v. Armstrong,* 143 F.3d at 703. "The essential test is one of medical necessity and not one simply of desirability."*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986).

**\*6** Here, construing the Complaint liberally, Plaintiff has failed to meet either the objective or the subjective component requirements of deliberate indifference to his medical needs. Absent from the Complaint are any allegations which can be construed as indicating (1) Plaintiff had an urgently, serious medical condition capable of producing "death, degeneration, or extreme pain," and (2) prison medical staff knew of and disregarded an excessive risk to Plaintiff's health and safety. Except for stating that he was "in pain," the Complaint does not describe the level or extent of the pain, the particular condition(s) with which the pain was associated, any resulting inability to engage in normal activities, or any harm consequently experienced or likely to occur. Additionally, the Complaint fails to specify the nature of the complaints made to Nurse Wilson, and the Court must disregard, as conclusory and nonfactual, Plaintiff's allegation regarding Dr. Adam's history of negligently treating prison inmates.

By his allegations, Plaintiff appears to claim that Dr. Adams, Nurse Wilson and Nurse Doe either did not believe he had any pain, or disputed the severity of the pain, and acting on these beliefs, Nurse Doe refused Plaintiff's requests to see the doctor; Dr. Adams ordered his neck brace and walking cane taken away, did not permit him to see the physical therapist; and Nurse Wilson told him to stop lying. These

allegations not only fail to show that in doing so, prison medical officials acted with deliberate indifference, *i.e.,* "for the very purpose of causing harm or with knowledge that harm will result," *Chance v. Armstrong,* 143 F.3d at 703, they reflect Plaintiffs disagreement with their evaluation and assessment of his medical circumstances. Plaintiff's mere disagreement over proper medical treatment does not give rise to a constitutional claim. *Id.; see also Arnold v. Westchester County,* 2012 U.S. Dist. LEXIS 12992, at *34–35, 2012 WL 336129 (S.D.N.Y. February 3, 2012) ("Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments not the Eighth Amendment") (citation omitted). This claim is therefore dismissed.

### c. Failure to Protect

The Eighth Amendment also imposes duties on prison officials to "take reasonable measures to guarantee the safety of the inmates" in their custody. *Farmer v. Brennan,* 511 U.S. at 832 (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). An inmate asserting a failure to protect claim under the Eighth Amendment must establish both that the deprivation alleged is sufficiently serious—imposing a substantial risk of serious harm, *id.* at 834, and that the defendant acted with a "sufficiently culpable state of mind"—" 'deliberate indifference' to the inmate's health and safety." *Hope v. Pelzer,* 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Thus, prison officials are liable for failure to protect inmates only when they "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. at 837. A prison "official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Id.* at 838. "Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 835 (internal quotes omitted). Significantly, for purposes of analyzing Eighth Amendment claims, "the Supreme Court has drawn a 'distinction between mere negligence and wanton conduct....' " *Graham v. Poole,* 476 F.Supp.2d 257, 260 (W.D.N.Y.2007) (citing *Whitley v. Albers,* 475 U.S. 312, 322, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

**\*7** Accepting as true, Plaintiff's allegations that the attention of CO. Pietrie, CO. Koon and CO. Newark was diverted by a female officer transporting another inmate, and they "neglected their responsibilities" by permitting him, while shackled incorrectly, to proceed unescorted down the stairs and as a result, he slipped and fell down the stairs, sustaining injuries to his neck, back and wrist, the Complaint, at most, alleges no more than a simple claim of negligence, which under well settled law, *see Daniels v. Williams,* 474 U.S. 327 (1986), does not give rise to a cause of action under § 1983, even if corrections staff had actual or constructive knowledge of the danger. *See, e.g., Cox v. Nassau County Corr. Ctr.,* 2013 U.S. District LEXIS 31622, at *7–8, 2013 WL 831194 (E.D.N.Y. Feb. 15, 2013); *Graham v. Poole,* 476 F.Supp.2d at 260 (in case concerning prisoner slip-and-all claim, holding that "[a]lthough plaintiff alleges that defendants were aware of the dangerous condition of the shower floor and failed to rectify it, that amounts to nothing more than negligence, and is not enough to establish an Eighth Amendment claim"). Even if C.O. Pietrie, C.O. Koon and C.O. Newark actually or constructively knew of the danger, Plaintiff has failed to state an Eighth Amendment claim in that he has alleged no facts showing that they consciously disregarded an excessive risk to his health or safety. In the absence of allegations that these corrections officers displayed deliberate indifference to his health or safety, this claim is dismissed.

### d. Denial of Equal Protection

Lastly, the Complaint alleges, in cursory fashion and without elaboration, a violation of the Equal Protection Clause of the Fourteenth Amendment. ECF No. 1. To state a viable equal protection claim under the Fourteenth Amendment, "a plaintiff generally must allege either 'purposeful discrimination ... directed at an identifiable or suspect class,' " *Barnes v. Fedele,* 760 F.Supp.2d 296, 301 (W.D.N.Y. January 13, 2011) (quoting *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)) (citing *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)), or that he or she "has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment." *Id.* (citing *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)) (per curiam).

Upon even the most liberal reading, the Complaint asserts no set of facts from which to construe the occurrence of the claimed Equal Protection violation. For this reason, the claim must be dismissed.

#### IV. CONCLUSION

I conclude that Plaintiff has failed to nudge any of his claims "across the line from conceivable to plausible," *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 570, and the Complaint filed in Case No. 13–CV–6170 must be dismissed. Defendants' motion to dismiss (ECF No. 10) is granted. The Clerk of the Court is hereby directed to dismiss the Complaint and, accordingly, close this case forthwith.

**\*8** IT IS SO ORDERED.

#### All Citations

Slip Copy, 2014 WL 3695488

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3169391
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Daniel RILES, Plaintiff,

v.

Daniel BANNISH, et al., Defendants.

No. 3:10–CV–652(RNC).
|
Aug. 11, 2010.

**Attorneys and Law Firms**

Daniel A. Riles, Jr., Somers, CT, pro se.

### *INITIAL REVIEW ORDER*

ROBERT N. CHATIGNY, District Judge.

**\*1** Plaintiff, an inmate at Northern Correctional Institution, brings this action pro se pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986 against sixteen employees of the Department of Correction ("DOC"), as well as a Connecticut state trooper, all of whom are sued in their individual capacities only. The complaint claims damages for assault, conspiracy, deliberate indifference to serious medical needs and intentional infliction of emotional distress. Under 28 U.S.C. § 1915A, the Court must review the complaint and dismiss any part of it that fails to state a claim on which relief can be granted.[1]

---

[1]    The caption of the complaint includes as defendants Dr. Rutherford and Dr. Miranda, but neither of them is mentioned in the body of the complaint. Accordingly, the complaint against them will be dismissed without prejudice for failure to state a claim on which relief can be granted.

### I. The Complaint

The complaint alleges the following. On March 17, 2008, the plaintiff was assaulted at Northern by Correction Officer ("CO") Michael Blue. A surveillance camera recorded the assault on videotape. As a result of the assault, the plaintiff sustained fractures of his left and right nasal bones. CO Carl Badeau, who witnessed the assault, ran up to Blue and remarked that he was going to have to "say something good."

They agreed to falsely claim that the plaintiff had tried to spit on Blue.

Plaintiff was taken to the medical unit at Northern, where defendant Paul Wilbur, a nurse in the medical unit, gave him an ice pack for his nose. No x-ray was taken.[2] While in the medical unit, plaintiff complained to defendants Robert Ames and Ned McCormick, both supervisors on duty at the time, that Blue had assaulted him. They assured the plaintiff that his complaint would be investigated and Ames took photographs of the plaintiff's face and head. As a result of DOC's investigation, plaintiff's complaint was substantiated and disciplinary action was taken against Blue. No disciplinary proceeding was initiated against the plaintiff, however.

---

[2]    A medical incident report prepared by Nurse Wilbur contains the following "assessment" of the plaintiff's condition: "Alert and oriented X3, gait steady, small amount of blood left nostril, no active bleeding noted, neuro signs intact, nose midline with slight edema right side. No other injury noted."

Plaintiff wrote to the Connecticut State Police reporting the assault. Defendant Bissaillon, a state trooper, took a statement from the plaintiff. Bissaillon told the plaintiff that he had viewed the videotape of the incident and spoken with Blue and Badeau. According to the plaintiff, Bissaillon stated that he had agreed not to arrest Blue and that the plaintiff would be arrested if he "pushed the issue."

On March 18, 2008, the day after the assault, the plaintiff submitted a sick call request to the medical staff at Northern stating that he was in pain. He requested pain management and an x-ray of his nose. Six days later, on March 24, 2008, he was seen by Dr. Carson Wright, a physician at Northern. Plaintiff told Dr. Wright that he was in excruciating pain and believed his nose was broken. Dr. Wright ordered an x-ray of the plaintiff's nose, but failed to provide the plaintiff with pain medication, allegedly telling him to "man-up" and "take the pain."

On April 7, 2008, an x-ray was taken of the plaintiff's nose. A report of the results was returned to the medical unit two days later. The report contains the following findings: "multiple nose fractures of the right and left nasal bone, mildly displaced." The medical unit did not inform the plaintiff of the results of the x-ray or provide him with any additional treatment.

**\*2** In early May 2008, the plaintiff submitted another sick call request. He stated that he was still in pain, his sense of smell was gone, and his ability to taste was diminishing. On June 23, he was seen by Dr. Wright. On that date, Dr. Wright informed him of the x-ray results. According to the plaintiff, he caught Dr. Wright attempting to make a false entry in the chart. When questioned about this, Dr. Wright allegedly told the plaintiff, "I fucked up."

On June 29, 2008, plaintiff submitted an "inmate administrative remedy form" complaining about Dr. Wright's failure to provide adequate care for his broken nose and requesting to be seen by an outside doctor.

On July 21, Dr. Wright submitted a request to the Utilization Review Committee ("URC"), headed by defendant Mark Buchanan, asking that the plaintiff be checked by an ear, nose and throat specialist ("ENT"). In his request, Dr. Wright stated that the plaintiff was complaining about losing his ability to smell and taste food, that Dr. Wright had spoken with an ENT about this, and that the ENT had recommended that the plaintiff be seen by a specialist. Dr. Wright received no response from the URC. According to the complaint, Dr. Wright followed up with additional requests for the plaintiff to be seen by an ENT but these requests also were ignored.

In September 2008, plaintiff began to have recurring nosebleeds from his right nostril, which worsened over time. He informed medical staff at Northern. Defendant Wendy Sanders, a staff nurse, told him the nosebleeds were a normal reaction to temperature change within the unit and should be addressed by drinking fluids. To stop the nosebleeds, medical staff packed the plaintiff's nose with gauze and instructed him to do the same. The individuals who did this are not identified in the complaint. After using the nose packs, the plaintiff developed a severe nasal infection.

On December 12, 2008, Dr. Wright submitted another request to the URC asking that the plaintiff be seen by an ENT. On December 22, the URC denied the request. Plaintiff signed the denial from the URC on December 29, 2008. That same day, he filed a grievance complaining that the URC had failed to act on the requests submitted by Dr. Wright. On January 20, 2009, defendant Sanders denied the grievance, informing the plaintiff that he should speak with Dr. Wright regarding his concerns and sign up for sick call as needed.

On August 14, 2009, Dr. Wright submitted another request seeking approval for an ENT consult. This request was denied on September 15, 2009.

In October 2009, the plaintiff was examined by Dr. Syed Naqvi. Dr. Naqvi indicated that the nose packs used to stop the plaintiff's nosebleeds had been counterproductive in that they had caused the plaintiff's nasal infection and increased the bleeding. The doctor also indicated that a "smell test" administered to the plaintiff by Northern medical staff would not have aided in the diagnosis and treatment of his condition.

**\*3** Plaintiff claims that as a result of the defendants' unconstitutional acts and omissions, he continues to suffer recurring nosebleeds, can no longer smell or taste food and has "developed an ailment that will require his nose to be re-broken in order to be straightened." [3]

[3]     The nature of the "ailment" allegedly requiring that the plaintiff's nose be re-broken is not alleged.

## II. Analysis

### A. § 1983 Excessive Force Claim

Accepting the allegations of the complaint as true, they are sufficient to state a claim for compensatory and punitive damages against Blue under § 1983 for use of excessive force in violation of the Eighth Amendment.

### B. Conspiracy Claims Under §§ 1983 and 1985(3)

To adequately plead a conspiracy claim under § 1983, the plaintiff must allege facts showing that the defendants reached an agreement to violate one or more of his substantive constitutional rights and that he was actually injured as a result. To adequately plead a conspiracy claim under § 1985(3), he must further allege that the defendants' misconduct was racially motivated. Plaintiff's allegations do not satisfy these requirements.

The complaint alleges that Blue and Badeau conspired to falsely accuse the plaintiff of trying to spit on Blue. Filing a false charge of misconduct against a prisoner does not in itself violate a constitutional right. *Freeman v. Rideout,* 808 F.2d 949, 951–52 (2d Cir.1986)("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."). Moreover, the complaint expressly alleges that the plaintiff was never

disciplined as a result of the defendants' false statements. This claim is therefore dismissed without prejudice for failure to state a claim on which relief can be granted.

The complaint alleges that Ames and McCormick conspired to deprive the plaintiff of photos of pooled blood at the scene of the assault, which would help support a claim against Blue. The substantive constitutional right at issue here appears to be the right of access to courts. *See Bounds v. Smith, 430 U.S. 817, 821–23 (1977); Morello v. James, 810 F.2d 344, 347 (2d Cir.1987).* To allege a violation of this right, the plaintiff must allege that the defendants intentionally took action to obstruct or impede his ability to pursue a claim against Blue resulting in actual prejudice to his legal position. *See Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir.1997); Duff v. Coughlin, 794 F.Supp. 521 (S.D.N.Y.1992).* Plaintiff's allegation that Ames and McCormick conspired against him is implausible, particularly in light of the allegations of the complaint showing that the assault was recorded on videotape and Ames took photos of the plaintiff's face and head. Moreover, there is no allegation that the absence of photos of the scene has caused the plaintiff any actual prejudice. For these reasons, the claim against Ames and McCormick is dismissed without prejudice for failure to state a claim on which relief can be granted.

**\*4** The complaint alleges that Bissaillon conspired with Blue and others to deprive him of "the pursuit of justice through the criminal division."This claim appears to be based solely on Bissaillon's failure to take steps to have Blue prosecuted for assault. [4] Generally, a person is not entitled to sue a state official based solely on the nonprosecution of a criminal suspect. *See Thompson v. Grey, 2009 WL 2707397, (E.D.N.Y. Aug. 26, 2009),* aff'd, *2010 WL 2836637 (2d Cir. July 20, 2010).* Accordingly, this claim is dismissed without prejudice for failure to state a claim on which relief can be granted.

[4] Plaintiff does not allege that he is in danger of sustaining personal injury in the future as a result of Bissaillon's alleged agreement not to arrest Blue. *See Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 378 (2d Cir.1973); see also Okin v. Village of Cornwall–)n–Hudson Police Dept.,* 577 F.3d 414 (2d Cir.2009).

## C. Deliberate Indifference Claims
Plaintiff alleges that numerous individuals were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. A person is deliberately indifferent if he is aware of a serious medical need, and fails to provide treatment, consciously disregarding a substantial risk of serious harm. *Farmer v. Brennan, 511 U.S. 825, 834, 837 (1994).* This state of mind is the "equivalent of criminal recklessness." *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1994).* Generally, "mere allegations of negligent malpractice do not state a claim of deliberate indifference."*Id.*

Viewed in a light most favorable to the plaintiff, the allegations against Dr. Wright are sufficient to state a claim of deliberate indifference. According to the complaint, Dr. Wright responded to plaintiff's complaints of excruciating pain and his specific request for "pain management" by telling him to "man-up" and "take the pain." These allegations are sufficient to withstand review under § 1915A because the plaintiff may be able to prove that the failure to provide him with pain medication amounted to deliberate indifference. *See Dulany v. Carnahan, 132 F.3d 1234, 1244 (8th Cir.1997)*(callous comments can be evidence of deliberate indifference). In addition, the complaint alleges (expressly or by reasonable implication) that Dr. Wright failed to properly diagnose and treat the plaintiff's broken nose in a timely manner even though the injury and need for treatment were obvious. These allegations also are sufficient at this stage, especially in view of Dr. Wright's alleged comments to the plaintiff. Accordingly, the action will proceed against Dr. Wright. [5]

[5] Whether the allegations of the complaint are sufficient to support a claim for deliberate indifference against Dr. Wright with regard to the plaintiff's other medical problems (i.e. his recurring nosebleeds and alleged loss of the ability to taste and smell) is an issue that need not be addressed at this time and is better left until the plaintiff has the assistance of appointed counsel, which he has requested. By separate order, his request for appointed counsel will be granted.

The allegations of the complaint also are sufficient to state a claim for deliberate indifference against defendant Buchanan, head of the URC. According to the complaint, the URC ignored repeated requests by Dr. Wright that the plaintiff be seen by an ENT. These requests were based on the recommendation of an ENT, with whom Dr. Wright had spoken regarding the plaintiff's symptoms. The complaint, construed favorably to the pro se plaintiff, implicitly alleges that Buchanan was aware of Dr. Wright's repeated requests and failed to act due to deliberate indifference.

The allegations of the complaint fall short of supporting a deliberate indifference claim against Nurses Wilbur and Sanders. The complaint charges these defendants with "gross incompetence." But there is no allegation of an act or failure to act on the part of either of them evincing conscious disregard of a substantial risk of serious harm to the plaintiff's health. Both attempted to provide treatment for the plaintiff's symptoms and, although there were some delays in responding to his complaints, neither of them ignored his medical needs. *See Demata v. New York State Correctional Dep't of Health Services,* 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999)("Although a delay in providing medical care may in some cases constitute deliberate indifference, this Court has reserved such classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fastdegenerating condition for three days; or delayed major surgery for over two years.")(internal citations and quotations omitted). Importantly, in contrast to Dr. Wright, there are no allegations of callousness on the part of Wilbur or Sanders. [6] Accordingly, the deliberate indifference claim against them is dismissed without prejudice for failure to state a claim on which relief can be granted.

[6]    The allegation that nose packs should not have been used to stop the plaintiff's nosebleeds does not support a deliberate indifference claim against Nurse Wilbur or Nurse Sanders because there is no allegation that either of them used or instructed the plaintiff to use nose packs and, in any event, improper use of nose packs would not amount to deliberate indifference. The same is true of the allegations regarding the use of an incorrect "smell test" (i.e. there is no indication that either of these defendants was involved in the test and the use of an incorrect would not constitute deliberate indifference in any case). The allegation that Nurse Sanders denied the plaintiff's medical grievance concerning the URC's delay in responding to Dr. Wright's requests for a consult with an ENT also fails to support a claim against her. As she noted in the written denial, the plaintiff was being followed by Dr. Wright at that time.

**\*5** The allegations of the complaint also are insufficient to state a claim for deliberate indifference against defendants Bannish, Marcial, Hicock, Fury, Weiskopf and LaPalme. The complaint lumps these defendants together and asserts that they supported a policy designed to encourage incompetence on the part of medical staff. A prison official who is personally responsible for creating or maintaining a policy of deliberate indifference may be subject to liability, *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), but the allegation

of such a policy must be more than merely conclusory. *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009). [7]

[7]    With the exception of Bannish and LaPalme, there are no allegations that these defendants were aware of the plaintiff's injury or involved in his treatment. To the extent Bannish and LaPalme were made aware of plaintiff's health concerns, documents attached to the complaint indicate that they did not ignore plaintiff's concerns but relayed them to Dr. Wright.

### D. Intentional Infliction of Emotional Distress

The complaint includes a claim for intentional infliction of emotional distress under § 1983. There is no recognized cause of action under section 1983 for intentional infliction of emotional distress. Accordingly, this claim is dismissed without prejudice for failure to state a claim on which relief can be granted.

### III. Orders

In accordance with the foregoing analysis, the Court enters the following orders:

(1) All claims against defendants Badeau, Ames, McCormick, Bissaillon, Wilbur, Sanders, Bannish, Marcial, Hicock, Fury, Weiskopf, LaPalme, Rutherford and Miranda are hereby dismissed without prejudice for failure to state a claim on which relief can be granted.

(2) The claims for damages against defendants Blue, Wright and Buchanan in their individual capacities will proceed. No other claim or defendant will be included in the case unless a motion to amend filed in compliance with Federal Rule of Civil Procedure 15 is granted by the Court.

(3) Within ten (10) business days of this order, the Clerk will verify the current work addresses for defendants Blue, Wright and Buchanan and mail a waiver of service of process request packet to each in his individual capacity at his current work address. If any of these defendants fails to return the waiver request, the Clerk will make arrangements for in-person service by the U.S. Marshal and that defendant will be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4) The Pro Se Prisoner Litigation Office will send a courtesy copy of the complaint and this order to the Connecticut

Attorney General and the Department of Correction Legal Affairs Unit.

(5) The Pro Se Prisoner Litigation Office will send written notice to the plaintiff of the status of this action along with a copy of this order.

(6) Defendants will file their response to the complaint, either an answer or motion to dismiss, within seventy (70) days from the date of this order. If the defendants choose to file an answer, they will admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(7) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, will be completed within seven months (210 days) from the date of this order. Discovery requests need not be filed with the court.

 **\*6**  (8) All motions for summary judgment will be filed within eight months (240 days) from the date of this order.

(9) Pursuant to Local Civil Rule 9(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion may be granted absent objection.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3169391

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.    5

2015 WL 1471643
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Gerjuan TYUS, Plaintiff,
v.
Roger NEWTON, et al., Defendants.

No. 3:13–cv–1486(SRU).
|
Signed March 31, 2015.

**Attorneys and Law Firms**

Gerjuan Tyus, Somers, CT, pro se.

Elliot B. Spector, David C. Yale, Hassett & George, P.C., Simsbury, CT, Jonathan Zellner, John Wade Cannavino, Jr., Ryan Ryan Deluca, LLP, Stamford, CT, Karen Folster Lesperance, U.S. Attorney's Office, Albany, NY, for Defendants.

*RULING ON NEW LONDON
DEFENDANTS' MOTION TO DISMISS*

STEFAN R. UNDERHILL, District Judge.

**\*1** Gerjuan Tyus is currently incarcerated at Northern Correctional Institution in Somers, Connecticut. In October 2013, in both this Court and the Connecticut Superior Court for the Judicial District of New London, Tyus filed a civil rights action against defendants Roger Newton, City of New London, County of New London, City of New London Police Department, Chief of New London Police Department Margaret Ackley, Lieutenants Brian Wright and Todd Bergeson, Sergeants Christina and Kevin McBride, Officers Todd Lynch, Zelinski, Timothy Henderson, Liachenko, Marcaccio, Pelchat, Melissa Schafranski, Darrin Omara and Lamontagne, and Bureau of Alcohol, Tobacco and Firearms ("ATF") Agents Wheeler, Scott Riordan, Robert Harrison, Dennis Turman and Guy Thomas. On November 19, 2013, the defendants removed the state-court action to this Court. (*See Tyus v. City of New London, et al.,* Case No. 3:13cv1726(SRU), Pet. Removal, Doc. No. 1.)

On January 6, 2014, I granted a motion to consolidate the present case with the action that had been removed to this

Court by the defendants, *Tyus v. City of New London, et al.,* Case No. 3:13cv1726(SRU). The present case is the lead case and the member case, *Tyus v. City of New London, et al.,* Case No. 3:13cv1726(SRU), has been closed.

On April 29, 2014, I granted the plaintiff leave to file an amended complaint that named the City of New London, Chief of New London Police Department Margaret Ackley, Lieutenants Brian Wright and Todd Bergeson, Sergeant Christina, Sergeant Kevin McBride, Officers Roger Newton, Todd Lynch, Timothy Henderson, Melissa Schafranski, Darrin Omara, Zelinski, Liachenko, Marcaccio, Pelchat, Lamontagne and ATF Agents Wheeler, Scott Riordan, Robert Harrison, Dennis Turman and Guy Thomas as defendants. I also denied without prejudice the motion to dismiss filed by the New London defendants and dismissed the Sixth Amendment claims in Count 1 of the Amended Complaint and the conspiracy claims contained in Count V of the Amended Complaint pursuant to 28 U.S.C. § 1915A(b)(1). Thus, all claims in Count I and the conspiracy claims in Count V of the Amended Complaint have been dismissed. The remaining federal claims under the Fourth, Fifth and Fourteenth Amendments and state law tort and constitutional claims as set forth in Counts II, III(a), III(b), IV, V, VI, VII, VIII, IX, X, XI and XII[1] remain pending against all defendants in their individual and official capacities.

1    There are two counts labeled Count III, two counts labeled Count IX and two counts labeled Count X. I construe the first Count III as Count III(a) and the second Count III as Count III(b). I construe the second Count IX as Count XI and the second Count X as Count XII. (*See* Amended Complaint at 21–22, 25–27).

The New London defendants[2] have moved to dismiss the claims against them pursuant to Rule 12(b)6. The plaintiff has filed a memorandum in opposition to the motion.

2    The New London defendants include: the City of New London, Chief of New London Police Department Margaret Ackley, Lieutenants Brian Wright and Todd Bergeson, Sergeant Christina, Sergeant Kevin McBride, Officers Todd Lynch, Timothy Henderson, Melissa Schafranski, Darrin Omara, Zelinski, Liachenko, Marcaccio, Pelchat. Officer Roger Newton no longer works for the City of New London. He is represented by separate counsel, and has not moved to dismiss the Amended Complaint.

**I. Standard of Review**

When deciding a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)6, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 143 (2d Cir.2003). The court's review is limited to "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken"*Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993). The court considers not whether the plaintiff ultimately will prevail, but whether he has asserted sufficient facts to entitle him to offer evidence to support his claim. *See York v. Association of Bar of City of New York,* 286 F.3d 122, 125 (2d Cir.), *cert. denied,*537 U.S. 1089 (2002).

**\*2** In reviewing the complaint in response to a motion to dismiss, the court applies "a 'plausibility standard,' which is guided by two working principles."*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). First, the requirement that the court accept as true the allegations in the complaint " 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Iqbal,* 129 S.Ct. at 1949). Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. Determining whether the complaint states a plausible claim for relief is " 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id* . (quoting *Iqbal,* 129 S.Ct. at 1950). Even under this standard, however, the court liberally construes a *pro se* complaint. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (*per curiam* ) (internal quotation marks and citations omitted).

## II. Facts

The facts as they relate to the defendants identified as the New London defendants are taken from the Amended Complaint and are assumed to be true for purposes of this motion. In October 2010, a jury in this Court acquitted the plaintiff of all federal criminal charges in connection with an arrest that occurred in November 2009. *See United States, et al. v. Muller, et al.,* No. 3:09cr247(RNC) (Judgment of Acquittal after Jury Trial, Doc. No. 494). After his release from custody,

Officers Henderson, Lynch, Pelchut and Newton began to follow the plaintiff as he drove around City of New London.

On January 18, 2011, Officers Henderson and Lamontagne pulled the plaintiff over because they claimed the light on his marker plate was out. The officers claimed they smelled the odor of marijuana in the car and asked the plaintiff to exit the vehicle. Officer Lamontagne searched the plaintiff and removed cash and a knife from his pockets and Officer Henderson searched the plaintiff's vehicle. Officers Henderson and Lamontagne then returned the cash and the knife to the plaintiff and issued him a warning ticket for the defective marker plate light.

On January 22, 2011, Officers Henderson and Newton pulled the plaintiff over because his vehicle had no front marker plate. The officers said they smelled the odor of marijuana in the plaintiff's car and asked him to exit the vehicle. Officer Newton then searched the plaintiff. During the search, Officer Newton repeatedly reached into the plaintiff's pockets and gripped the plaintiff's buttocks and crotch. Officer Newton removed cash and a knife from plaintiff. After the search, Officer Newton returned the cash and the knife to the plaintiff and issued him a ticket for failure to display a front marker plate.

**\*3** Sergeant Kevin McBride verified the report prepared by Officer Newton regarding the stop and search of the plaintiff on January 22, 2011. When the plaintiff later attempted to challenge the traffic violation, a clerk at the Norwich Superior Court informed him that there was no traffic violation on record.

On February 5, 2011, Officer Newton pulled the plaintiff over for failure to display a front marker plate and for having tinted car windows. Officer Marcaccio arrived at the scene just after Officer Newton pulled the plaintiff over. Officer Newton asked the plaintiff to exit the vehicle. Officers Lynch and Pelchat then arrived at the scene.

Officer Newton conducted a search of the plaintiff. He repeatedly reached into the plaintiff's pockets and forcefully grabbed under and reached up into the plaintiff's buttocks and crotch area during the search. Officer Newton removed cash and a knife from the plaintiff. Officers Pelchat and Marcaccio stood by and observed the search. Officers Newton, Lynch, Pelchat and Marcaccio arrested the plaintiff on charges of carrying a dangerous weapon and possession of a weapon in

a motor vehicle. Officer Marcaccio transported the plaintiff to the New London Police station.

At the station during booking, Officer Lynch searched the plaintiff again. Sergeant Christina then authorized a body-cavity search of the plaintiff without seeking permission from the Chief of Police. Officers Newton, Lynch and Pelchat escorted the plaintiff to a room in order to perform the body cavity search. Officer Lynch put the plaintiff in a choke-hold from behind and slammed him to the floor while Officer Pelchat and Sergeant Christina looked on. Sergeant Christina threatened to use a taser on the plaintiff. Officer Newton pulled the plaintiff's pants down, conducted a body cavity search and retrieved two plastic bags that allegedly contained narcotics.

After the search, officers charged the plaintiff with additional criminal violations including: interfering with a police officer, possession of drug paraphernalia, possession of marijuana, possession of marijuana within 1500 feet of a housing project, possession of crack cocaine with intent to sell and possession of crack cocaine with intent to sell within 1500 feet of a housing project. Lieutenant Brian Wright verified the criminal complaint report prepared by Officer Newton regarding the stop and searches of the plaintiff on February 5, 2011. Subsequently, the plaintiff was able to post bond and officers released him from custody.

On February 28, 2011, a United States Magistrate Judge issued a warrant for the plaintiff's arrest on federal criminal charges based on the narcotics found on the plaintiff during the body cavity search conducted on February 5, 2011 by New London officers. *See United States v. Tyus,* No. 3:11cr45(EBB) (Docket Entry 1.) On March 3, 2011, Officers Newton, Omara, Henderson and Schafranski stopped the plaintiff's vehicle because there was an outstanding federal warrant for his arrest. Officer Newton asked the plaintiff to exit the vehicle because he said he smelled the odor of marijuana in the car.

 **\*4** Officer Newton conducted a search of the plaintiff as Officers Omara, Henderson and Schafranski looked on. Officer Newton forcefully grabbed under and reached up into the plaintiff's buttocks and crotch area while searching him. Officer Newton removed cash and a knife from the plaintiff, arrested the plaintiff pursuant to the outstanding federal arrest warrant as well as on charges of possession of a dangerous weapon and then transported him to the New London Police station. At the station, Lieutenant Bergeson

authorized a body-cavity search of the plaintiff. Officers Newton and Henderson conducted the search as Lieutenant Bergeson looked on.

On March 4, 2011, ATF Agents Riordan and Wheeler transported the plaintiff to federal court for his arraignment on the charge of possession of narcotics with intent to distribute in violation of federal criminal statutes 21 U.S.C. §§ 841(a) (1) and (b)(1)(B)(iii). On February 17, 2012, the United States moved to dismiss the federal criminal charges against the plaintiff after they became aware that one of the arresting New London Police officers had been identified as having planted drugs on a suspect during an arrest. *See United States v. Tyus,* No. 3:11cr45(EBB) (Doc. No. 71.) On February 21, 2012, the federal judge assigned to the plaintiff's criminal case, granted the motion to dismiss. (*See id.* at Doc. No. 72.) Tyus claims that the State of Connecticut later dismissed the weapon and drug charges that were the basis for his arrest on February 5, 2011.

## III. Discussion

The New London defendants argue that the plaintiff has failed: (1) to assert any facts regarding Officers Zelinski and Liachenko; (2) to state a claim of false arrest with regard to the February 5, 2011 and March 3, 2011 arrests; (3) to allege the personal involvement of defendants Ackley, Wright, Bergeson, Christina and McBride in the alleged constitutional violations; (4) to allege that a private right of action exists under Article I, sections 7, 9 and 10 of the Connecticut Constitution; (5) to allege facts to state a claim of negligent or intentional infliction of emotional distress; and (6) to state a claim of municipal liability against the City of New London. The plaintiff's opposition to the motion addresses some of these arguments.

As a preliminary matter, the motion to dismiss includes a section on the conspiracy claims that were included in the Amended Complaint in Count V. On April 29, 2014, I dismissed the conspiracy claims without prejudice to the plaintiff's re-pleading those claims within thirty days. Because the plaintiff did not re-plead the conspiracy claims, those claims are not in the case.

### A. Officers Zelinski and Liachenko

The defendants argue that the plaintiff has failed to assert any facts with regard to conduct by Officers Zelinski and Liachenko. The plaintiff identifies these defendants as employees of the New London Police Department.

Other than in the section of the Amended Complaint including a description of each defendant, the plaintiff does not otherwise refer to Officers Zelinski and Liachenko. As such, the plaintiff has not alleged that either defendant violated his federally or constitutionally protected rights or his rights under state law.

**\*5** In his response to the motion to dismiss dated July 6, 2014, the plaintiff alleges that Officers Zelinski and Liachenko were present during Officer Newton's frisk search of him on January 22, 2011. The plaintiff may not, however, amend the amended complaint in a memorandum in opposition to a motion to dismiss. *See, e.g., Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998) (declining to address merits of claim that "does not appear anywhere in the amended complaint and did not enter the case until [the plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss"); *Walia v. Napolitano,* 986 F.Supp.2d 169, 184 (E.D.N.Y.2013) ("Plaintiff cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss") (internal quotation marks and citations omitted); *Allah v. Poole,* 506 F.Supp.2d 174, 193 (W.D.N.Y.2007) ("Da memorandum of law or other motion papers are not proper vehicles by which to raise claims that are not asserted in the complaint").

I will not grant the plaintiff leave to file a second amended complaint to add allegations against defendants Zelinski and Liachenko because any claims against them regarding the January 22, 2011 [3] search would be barred by the statute of limitations. *See Lounsbury v. Jeffries,* 25 F.3d 131, 134 (2d Cir.1994) (holding that, in Connecticut, the general three-year personal injury statute of limitations period set forth in Connecticut General Statutes § 52–577 is the appropriate limitations period for civil rights actions asserted under 42 U.S.C. § 1983). The motion to dismiss is granted with respect to defendants Zelinski and Liachenko for failure to state a claim on which relief may be granted.

[3]    It is doubtful that Tyus could allege a plausible claim against Zelinski and Liachenko for failing to intervene to stop the frisk search on January 22, 2011. Frisk searches are generally brief and the squeezing alleged to have occurred while Tyus's pockets were searched is unlikely to have been readily observable.

## B. False Arrest Claims

The defendants contend that the plaintiff has failed to state a claim of false arrest regarding both the February 5, 2011 and March 3, 2011 arrests. The defendants argue that there was probable cause to arrest the plaintiff on February 5, 2011 and the arrest by Officer Newton on March 3, 2011 was made pursuant to a valid arrest warrant.

The Fourth Amendment's protections include the right to be free from unreasonable "seizures." *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). An allegation that a criminal prosecution was initiated against an individual without probable cause arises under the Fourth Amendment rather than the Fourteenth Amendment's substantive due process provision. *See Albright v. Oliver,* 510 U.S. 266, 274–75 (1994).

"Claims for false arrest or malicious prosecution, brought under [Section] 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). Under Connecticut law, " '[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another.' " *Russo v. City of Bridgeport,* 479 F.3d 196, 204 (2d Cir.) (quoting *Outlaw v. City of Meriden,* 43 Conn.App. 387, 392, 682 A.2d 1112, 1115 (1996), *cert. denied,* 522 U.S. 818 (2007)). "It is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest." *Johnson v. Ford,* 496 F.Supp.2d 209, 213 (D.Conn.2007) Probable cause only exists when police officers have "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Probable cause does not require a police officer to be certain that the individual arrested will be prosecuted successfully. *See Krause v. Bennett,* 887 F.2d 362, 371 (2d Cir.1989).

**\*6** Probable cause is presumed when the arrest is made pursuant to a warrant issued by a neutral magistrate. *See Walczyk v. Rio,* 496 F.3d 139, 155–56 (2d Cir.2007) ("Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause."). A plaintiff can overcome this presumption by demonstrating that his right not to be arrested without probable cause was violated when "the officer ...'knowingly and intentionally, or

with reckless disregard for the truth, made a false statement ...'
or omitted material information," and where "such false or
omitted information was 'necessary to the finding of probable
cause.' " *Soares v. Connecticut,* 8 F.3d 917, 920 (2d Cir.1993)
(citations omitted).

### 1. March 3, 2011 Arrest

The defendants argue that Officer Newton had probable cause
to arrest the plaintiff on March 3, 2011 because a valid arrest
warrant had been issued by a federal Magistrate Judge. The
plaintiff concedes that an arrest warrant had been issued for
his arrest on federal criminal charges. There are no allegations
that ATF Agent Riordan, who applied for the arrest warrant,
materially misled the Magistrate Judge into believing that
probable cause existed for the plaintiff's arrest.

In opposition to the motion to dismiss, the plaintiff now
contends that the affidavit of ATF Agent Riordan contained
inaccurate information. The plaintiff did not include those
allegations in the Amended Complaint. The plaintiff may
not now amend his Amended Complaint by asserting new
allegations regarding the of veracity of statements in the
affidavit in support of the arrest warrant in his memorandum
in opposition to the motion to dismiss. *See, e.g., Wright v.
Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998); *Walia
v. Napolitano,* 986 F.Supp.2d 169, 184 (E.D.N.Y.2013);
*Allah v. Poole,* 506 F.Supp.2d 174, 193 (W .D.N.Y.2007).
I will not grant the plaintiff leave to file a second amended
complaint to add new allegations regarding the viability
of the warrant for his arrest because any such false arrest
claim would be barred by the statute of limitations. *See
Wallace v. Kato,* 549 U.S. 384, 388–89 (2007) (statute of
limitations for a claim of false arrest, which is a "species"
of false imprisonment, begins to run "when the alleged false
imprisonment ends."An alleged false imprisonment ends
when "the victim becomes held pursuant to [legal] process—
when, for example, he is ... arraigned on charges.") (emphasis
omitted). [4]

[4]    The docket in the plaintiff's federal criminal case reflects
       that he was arraigned on April 8, 2011. *See United States
       v. Tyus,* No. 3:11cr45(EBB) (Docket Entry No. 16.) The
       plaintiff first asserted that the search warrant affidavit
       was inaccurate in his memorandum in opposition to the
       motion to dismiss, which was filed on July 9, 2014, more
       than three years later.

Probable cause for the plaintiff's arrest on March 3, 2011
is presumed because Officers Newton, Lynch, Pelchat and

Marcaccio arrested him pursuant to an arrest warrant issued
by a federal magistrate judge. There are no timely allegations
to overcome that presumption. Accordingly the plaintiff's
false arrest claim fails. The motion to dismiss is granted with
respect to the claim that defendants Newton, Lynch, Pelchat
and Marcaccio falsely arrested him on March 3, 2011.

### 2. February 5, 2011 Arrest

 **\*7**  The defendants contend that Officer Newton had
probable cause to arrest the plaintiff on a charge of carrying
a dangerous weapon on February 5, 2011. Tyus alleges that
Officer Newton did not have probable cause to search or
arrest him after pulling him over for a traffic violation that
day. He alleges that Officer Newton claimed to have smelled
marijuana in his vehicle after he pulled him over for a traffic
violation, and that based on his suspicion that the plaintiff had
been using marijuana in the vehicle, Officer Newton ordered
him to step out of his car so that he could conduct a pat-
down search. The plaintiff alleges that the pat-down search
was more intrusive than necessary. The plaintiff claims that
Officer Newton found a knife in his possession, which was
the same knife that he had possessed when he was pulled
over on January 18 and 22, 2011. The officers who pulled the
plaintiff over on those two prior occasions, one of whom was
Officer Newton, did not arrest the plaintiff on weapon or any
other charges, but instead permitted him to leave with only
a traffic violation citation. On February 5, 2011, however,
Officers Newton, Lynch, Pelchat and Marcaccio decided to
charge the plaintiff with possession of a dangerous weapon
and possession of a weapon in a motor vehicle in violation of
Connecticut General Statutes §§ 29–38 and 53–206.

The plaintiff contends that probable cause did not exist for the
search that took place outside his vehicle because there was
no basis for Officer Newton's suspicion of marijuana use. The
defendants do not address the legality of the pat-down search.
The plaintiff also argues that the type of knife he possessed
did not have the necessary characteristics to be illegal to
carry under the relevant statute, and that no reasonable officer
would believe otherwise, so there was no probable cause to
arrest him. But even if there was probable cause to arrest him
for carrying the knife, it never would have been discovered
but for the challenged pat-down search. If, as Tyus alleges,
the alleged suspicion of marijuana use was pretextual and the
search unlawful, then the knife was fruit of the poisonous
tree. The plaintiff also argues that probable cause did not exist
for the additional criminal charges that were brought against
him after the body cavity search was conducted at the New
London Police Department later on February 5, 2011, but the

defendants do not address that claim or the claim regarding the legality of the body cavity search.

I conclude that the plaintiff has asserted sufficient facts to state a plausible claim that Officers Newton, Lynch, Pelchat and Marcaccio arrested him without probable cause on February 5, 2011. The motion to dismiss is denied with respect to the claim of false arrest in connection with the February 5, 2011 arrest on dangerous weapon charges.

### C. Personal Involvement of Chief of Police Ackley, Lieutenants Wright and Bergeson and Sergeants Christina and McBride

**\*8** The defendants argue that the plaintiff has failed to sufficiently allege the involvement of supervisory officials Chief Ackley, Lieutenants Wright and Bergeson, and Sergeants Christina and McBride in the alleged violations of the plaintiff's constitutional rights. To recover money damages under section 1983, the plaintiff must show that these defendants were personally involved in the constitutional violations. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Supervisory officials cannot be held liable under section 1983 solely for the acts of their subordinates. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

The plaintiff may show personal involvement by demonstrating one or more of the following criteria: (1) the defendant actually and directly participated in the alleged unconstitutional acts; (2) the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendant created or approved a policy or custom that sanctioned objectionable conduct that rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) the defendant was grossly negligent in supervising the correctional officers who committed the constitutional violation; and (5) the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct. *See Colon,* 58 F.3d at 873 (citation omitted). In addition, the plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury. *See Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Supreme Court held that a supervisor can be held liable only "through the official's own individual actions." *Id.* at 676. That decision arguably casts doubt on the continued viability of some of the categories for supervisory liability. The Second Circuit, however, has not revisited the criteria for supervisory liability

following *Iqbal. See Rispardo v. Carlone,* 770 F.3d 97, 117 (2d Cir.2014) ("We have not yet determined the contours of the supervisory liability test ... after *Iqbal.*"); *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) (noting that decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but finding it unnecessary to reach the impact of *Iqbal* on the personal involvement requirements set forth in *Colon,* 58 F.3d at 873). Because it is unclear whether *Iqbal* overrules or limits *Colon,* I will continue to apply the categories for supervisory liability set forth in *Colon.*

### 1. Chief Ackley

The defendants contend that the plaintiff has not alleged that Chief Ackley was personally involved in the traffic stops, searches or arrests of the plaintiff. The plaintiff alleges that Chief Ackley, as a supervisor and administrator who is responsible for the discipline of police officers, should have known about the misconduct that occurred when members of the New London Police Department pulled him over for alleged traffic violations, searched him and arrested him in 2011. The plaintiff generally alleges that there was a breakdown in the City's policies and inadequate review of arrests made by New London Police officers.

**\*9** These allegations are conclusory and are not supported by any facts. There are no factual allegations to suggest that Chief Ackley was aware of the incidents involving the plaintiff in January, February and March 2011. Nor does the plaintiff allege that he or anyone else put Chief Ackley on notice of alleged unconstitutional conduct by New London Police officials. The plaintiff has failed to allege the personal involvement of Chief Ackley in the violations of his constitutional rights. The motion to dismiss is granted with respect to the claims against defendant Ackley in her individual capacity on the ground of lack of personal involvement. [5]

5       Tyus does not appear to seek any declaratory or injunctive relief against defendant Ackley, and to the extent that he seeks to include any claim against her in her official capacity, it is duplicative of his claim of municipal liability against the City of New London, discussed below. Accordingly, the motion to dismiss is granted with respect to all claims against defendant Ackley in her official capacity as well.

## 2. Lieutenant Wright and Sergeant McBride

The plaintiff claims that Sergeant Kevin McBride verified the report prepared by Officer Newton regarding the stop and search that occurred on January 22, 2011. The plaintiff alleges that Lieutenant Brian Wright verified the criminal complaint report prepared by Officer Newton regarding the stop and searches that occurred on February 5, 2011.

The plaintiff contends that by signing off on the incident reports defendants McBride and Wright became aware of the January 22, 2011 traffic stop and pat-down search conducted by Officers Newton and Henderson and the February 5, 2011 traffic stop, pat-down search, and body cavity search conducted by Officers Newton, Lynch, Pelchat and Marcaccio as well as his arrest by those officers on various criminal charges. The plaintiff has alleged sufficient facts to plausibly demonstrate that defendants Wright and McBride became aware of the illegal traffic stops, searches and false arrest of the plaintiff, but failed to take any action to correct that unconstitutional conduct. Accordingly, the motion to dismiss is denied on the ground that the plaintiff has alleged no facts against defendants Wright and McBride regarding the traffic stops, searches and seizure of the plaintiff that occurred on January 22, 2011 and February 5, 2011.

## 3. Sergeant Christina and Lieutenant Bergeson

The plaintiff has alleged that Sergeant Christina authorized and was present for the body cavity search conducted by Officers Newton on February 5, 2011. In addition, the plaintiff has alleged that Lieutenant Bergeson authorized the body cavity search conducted by Officers on March 3, 2011. The plaintiff claims that both searches were illegal, intrusive, and unconstitutional. I conclude that those allegations demonstrate the involvement of defendants Christina and Bergeson in the various searches of the plaintiff. The motion to dismiss is denied with respect to defendants Christina and Bergeson on the ground of lack of personal involvement.

## D. Municipal Liability

The defendants argue that the plaintiff has failed to state a claim of municipal liability against the City of New London. In order to impose liability on a municipal entity under section 1983 for a violation of constitutional rights, a plaintiff must show that the violation was caused by a municipal policy or custom. *See Monell v. N.Y. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). Municipal policies "include[ ] the decisions of a government's lawmakers, the acts of its policymaking

officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011).

*\*10* A municipality, however, cannot be held liable "solely because it employs a tortfeasor—or in other words ... on a respondeat superior theory." *Monell,* 436 U.S. at 691. Instead, municipal liability may be established if a plaintiff can "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury" or that "action pursuant to official municipal policy or custom caused the alleged constitutional injury." *Cash v. Cnty of Erie,* 654 F.3d 324, 333 (2d Cir.2011) (internal quotation marks and citations omitted).

"A municipal policy may be pronounced or tacit and reflected in either action or inaction. In the latter respect, a city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 334 (internal quotation marks and citation omitted). Thus, a plaintiff may "establish municipal liability by showing that a municipal policy or custom existed as a result of the municipality's deliberate indifference to the violation of constitutional rights, either by inadequate training or supervision." *Russo v. City of Hartford,* 341 F.Supp.2d 85, 107 (D.Conn.2004).

Liability based on a failure to train is the most tenuous form of municipal liability under *Monell.* To state a claim under section 1983, "a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under section 1983." *Connick,* 131 S.Ct. at 1359–60 (citing *Canton v. Harris,* 489 U.S. 378, 388–89 (1989) (internal quotation marks omitted)). The most important consideration is "whether the facts demonstrate that the policymaker's failure to train or supervise was the result of a 'conscious choice' rather than mere negligence." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 128 (2d Cir.2004) (quoting *Canton,* 489 U.S. at 389).

Here, the plaintiff claims that he suffered violations of his constitutional rights because the City of New London failed to properly train the members of the New London Police Department in how to conduct pat-down and body cavity searches. In addition, the plaintiff's allegations may be

construed to state a claim that there was a policy or custom of New London Police officers to engage in pretextual or arbitrary traffic stops, detentions, searches and arrests without reasonable suspicion or cause. The plaintiff suggests that the City of New London failed to properly train its officers to prevent the unconstitutional conduct that occurred during the multiple traffic stops and searches, as well as his arrest in 2011.

The plaintiff generally alleges that there were repeated complaints of constitutional violations and a pattern of police misconduct, but refers to another specific incident that occurred in October 2010, and involved a traffic stop by Officer Newton that resulted in an arrest after narcotics were allegedly found near the suspect's vehicle. The charges against the individual were subsequently dismissed after a videotape taken at the scene of the traffic stop allegedly showed Officer Newton planting narcotics near the individual's vehicle. The plaintiff also mentions an incident during which an unidentified officer allegedly slapped a woman at a casino nightclub and another incident during which unidentified officers allegedly punched and pepper-sprayed a man who needed to be taken to the hospital from a detoxification center.

*11 "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."*Connick,* 131 S.Ct. at 1360 (quoting *Bryan Cty. v. Brown,* 520 U.S. 397, 409 (1997)). The plaintiff has alleged that in the first three months of 2011, New London Police officers pulled him over three times for alleged traffic violations, conducted intrusive pat-down searches on at least three occasions, searched his vehicle without permission on at least one occasion, and arrested him without probable cause on one occasion. In addition, officers conducted body cavity searches on two occasions.

In view of the number of alleged unconstitutional traffic stops, searches, and arrests involving the plaintiff and at least one other individual prior to the incidents involving the plaintiff, I conclude that the plaintiff has alleged sufficient facts to state a plausible claim that the City of New London had a custom or policy of tolerating police misconduct and acted with deliberate indifference by poorly training or supervising its officers regarding motor vehicle stops, detentions, pat-down and body cavity searches, and arrests. *See Goode v. Newton,* 2013 WL 1087549, at *8 (D.Conn. Mar. 14, 2013) (denying motion to dismiss City

of New London on ground that non-conclusory allegations of one prior incident of falsifying a police report and manufacturing criminal charges in addition to the two incidents of manufactured criminality in amended complaint raised plausible inference that City had informal custom of tolerating misconduct by its officers and that custom caused the plaintiff's constitutional violations); *Castilla v. City of New York,* No. 09 Civ. 5446(SHS), 2012 WL 3871517, at * 4–5 (S.D.N.Y. Sept. 6, 2012) (denying motion for judgment on the pleadings regarding municipal liability because plaintiff alleged "a string of incidents in which she was victimized by multiple officers in multiple locations, both on and off City property" as well as "various other instances of male police officers taking sexual advantage of females under their custody or control"); *Michael v. County of Nassau,* No. 09–CV–5200(JS)(AKT), 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010) (denying motion to dismiss municipal liability claims against County because multiple denials of plaintiff's rights over a long, continuous time period by at least five officers created "plausible inference that Nassau County has an informal policy or custom of at least tolerating police misconduct ... Likewise, the alleged involvement of numerous officers, the mocking Plaintiff allegedly received when invoking his right to counsel, and the headquarters location, suffices to suggest that Nassau County poorly trained and/or supervised its officers concerning the need not to violate suspects' civil rights."). Accordingly, the motion to dismiss is denied with respect to the claims against the City of New London.

**E. Connecticut Constitutional Claims**

*12 The plaintiff alleges that defendants Wright, Christina, Newton and Lynch violated his rights under Article I, sections 7 and 10, and all individual defendants violated his rights under Article I, sections 9 and 10 of the Connecticut Constitution. Article 1, section 7 of the Connecticut Constitution provides that "people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, or without probable cause supported by oath or affidavit."Conn. Const. art. 1, § 7. Article 1, section 9 provides that [n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." Conn. Const. art. 1, § 9.Article 1, section 10 provides that "[a]ll courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice

administered without sale, denial or delay."Conn. Const. art. 1, § 10.

## 1. Article I, Section 10

The defendants contend that the plaintiff has no private right of action for money damages under Article I, section 10. There are no cases in which a Connecticut court has recognized a private right of action under Article I, section 10 of the Connecticut Constitution. *See Sentementes v. General Elec. Co.,* Civil Action No. 3:14–CV–00131(VLB), 2014 WL 2881441, at *10 (D. Conn. June 25, 2014) (dismissing claim that defendants violated "Article I, section 10 of the Connecticut state constitution... [because] Connecticut courts do not recognize a private right of action under that clause"); *Thibault v. Barkhamsted Fire Dist.,* No. CV126008093S, 2013 WL 6038259, at *4 (Oct. 21, 2013) (refusing to "recognize a cause of action for alleged violations of article first, § 10 of the Connecticut constitution"); *Marinella v. Town of Darien,* No. 3:07–cv–910(CFD), 2010 WL 3123298, at *5 (D.Conn. Aug. 9, 2010) (no cause of action under Article I, sections 8 or 10 of the Connecticut constitution). Instead, the Connecticut Supreme Court has held to the contrary. *Binette v. Sabo,* 244 Conn. 23, 32, 710 A.2d 688, 691–92 (1998) (Article 1, section 10 "does not itself create new substantive rights but, instead protects access to our state's courts" and no direct constitutional action for damages exists under this section). Accordingly, the motion to dismiss is granted with respect to the claims for money damages under Article I, section 10 of the Connecticut Constitution.

## 2. Article I, Sections 7 and 9

In *Binette v. Sabo,* 244 Conn. 23, 25–26, 710 A.2d 688, 689 (1998), the Connecticut Supreme Court relied on *Bivens v. Six Unknown Named Agens of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), to recognize a private cause of action for monetary damages against municipal police officers for violations of Article 1, sections 7 and 9 of the Connecticut Constitution based on an alleged unreasonable search and seizure and unlawful arrest. Tyus has asserted no facts to suggest that Chief Ackley was involved in or aware of searches conducted by officers or arrests of the plaintiff made in January, February or March 2011. Thus, the plaintiff has failed to allege that defendant Ackley violated his rights under the Connecticut Constitution. The motion to dismiss is granted with respect to the claims under Article I, sections 7 and 9 of the Connecticut Constitution against defendant Ackley.

*13 The defendants argue that the *Binette* decision does not imply a damages cause of action against a municipality. Thus, they move to dismiss the claims under Article I, sections 7 and 9 of the Connecticut Constitution against the City of New London. Research has revealed no Connecticut case law recognizing municipal liability for violations of Article I, sections seven or nine of the Connecticut Constitution. *See Bazzano v. City of Hartford,* No. CV 980584611S, 1999 WL 1097174, at * (Conn.Super.Ct. Nov. 18, 1999) (granting motion to strike claim against municipality for violations of Connecticut Constitution Article First, sections 7 and 9 because "the deterrent effects of the *Bivens* remedy [against the officers] would be lost if the court was to imply a damages cause of action directly against the municipality and a supervisor"). Accordingly, the motion to dismiss is granted with respect to the claims under the Connecticut Constitution against the City of New London.

Pursuant to *Binette,* the search and seizure claims under the Fourth Amendment will proceed against defendants Wright, Bergeson, Christina, McBride, Lynch, Henderson, Marcaccio, Pelchat, Melissa Schafranski, Omara and Lamontagne. The motion to dismiss is denied against those defendants with respect to the claims under the Connecticut Constitution's search and seizure provisions set forth in Article I, sections 7 and 9.

## F. Infliction of Emotional Distress and Negligence Claims

In Counts VIII and IX, the plaintiff alleges that the defendants subjected him to assault and battery, mental and emotional distress and physical pain. In addition, the plaintiff claims that the defendants' conduct constituted gross negligence. The defendants argue that the claims for negligence and infliction of emotional distress should be dismissed.

A claim for intentional infliction of emotional distress requires a plaintiff to prove "that the [defendant] intended to inflict emotional distress or that he knew or should have known" that his conduct would cause emotional distress, "that the conduct was extreme and outrageous," that the plaintiff's distress was caused by the defendant's conduct and that the plaintiff suffered severe emotional distress. *Appleton v. Bd. of Ed.,* 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000) (citation omitted). To state a claim of negligent infliction of emotional distress, a plaintiff must plead that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe

enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress."*Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 444, 815 A.2d 119 (2003).

Tyus's allegations that the defendants' conduct caused him mental and emotional suffering and distress are not supported by facts that suggest the distress he suffered was severe enough to maintain an intentional infliction of emotional distress claim. He has not alleged facts sufficient to infer that any emotional distress he suffered was "severe enough that it might result in illness or bodily harm."*Id.* Thus, the plaintiff has not plausibly alleged a claim of intentional or negligent infliction of emotional distress.

 **\*14** Furthermore, under Conn. Gen.Stat. § 52–584, "[n]o action to recover damages for injury to the person ... caused by negligence, or reckless or wanton misconduct ... shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered."Thus, any claim for negligence or negligent infliction of emotional distress should have been brought prior to March 3, 2013. The plaintiff commenced this action in October 2013. The plaintiff's claims of negligence and negligent infliction of emotional distress are time-barred. The motion to dismiss is granted as to the claims of negligence and negligent and intentional infliction of emotional distress.

## IV. Conclusion

The Motion to Dismiss [**Doc. No. 39**] is **GRANTED** with respect to all claims against defendants Zelinski and Liachenko, the claims under Article I, sections 7 and 9 against defendants Ackley and the City of New London, all claims against defendant Ackley in her individual and official capacities, the claim that defendants Officers Newton, Lynch, Pelchat and Marcaccio falsely arrested the plaintiff on March 3, 2011, and the state law claims of negligence and intentional and negligent infliction of emotional distress and under Article I, section 10 of the Connecticut Constitution against all defendants. The Motion to Dismiss [**Doc. No. 39**] is **DENIED** in all other respects.

With regard to the New London defendants, the case will proceed on the Fourth Amendment search and seizure and excessive force claims, the Fourteenth Amendment equal protection claim, and the state law claims of assault and battery against defendants Wright, Bergeson, Christina, McBride, Lynch, Henderson, Marcaccio, Pelchat, Schafranski, Omara and Lamontagne in their individual and official capacities; the case will proceed on the Connecticut Constitutional Claims under Article I, sections 7 and 9 against defendants Wright, Bergeson, Christina, McBride, Lynch, Henderson, Marcaccio, Pelchat, Schafranski, Omara and Lamontagne in their individual capacities; and the case will proceed only on the Fourth and Fourteenth Amendment claims against the City of New London.

SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 1471643

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.