UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TYRRONE R. WATSON,

        **Plaintiff,**

v.                                                                             1:15-cv-1356(BKS/DEP)

**CITY OF KINGSTON-KINGSTON POLICE DEPT,**
**BRIAN GROTHKOPP, EDDIE ALVAREZ,**
**CHRISTOPHER SPYLIOUS, TRAVIS R. WILBER,**
**EGIDI TINTI CHIEF OF POLICE KPD,**

        **Defendants.**
_____

**APPEARANCES:**

Tyrrone R. Watson, Pro se
13-A-4239
Coxsackie Correctional Facility
P.O. Box 999
Coxsackie, NY 12051

*For Defendants*
Michael T. Cook
Cook, Netter, Cloonan, Kurtz & Murphy, P.C.
85 Main Street, P.O. Box 3939
Kingston, NY 12402

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

Plaintiff pro se Tyrrone Watson brings this action against Defendants under 42 U.S.C. § 1983 and New York State law for alleged constitutional injuries resulting from his arrest on October 18, 2012 and subsequent prosecution. (Dkt. No. 83). Plaintiff brings six causes of action: (1) false arrest; (2) excessive force; (3) deliberate indifference to medical needs; (4) a

1

*Monell* claim for municipal liability; (5) violation of due process; and (6) violation of equal protection. (Dkt. No. 83). Presently before the Court is Defendants' motion for summary judgment[1] with respect to Plaintiff's excessive force, failure to intervene, and *Monell* claims.[2] (Dkt. No. 108). For the following reasons, Defendants' motion is granted in part and denied in part.

## II. STATEMENT OF MATERIAL FACTS

Defendants' Statement of Material Facts, contains no citations to the record for any of the 19 statements of material fact. (Dkt. No. 108-7). It therefore wholly fails to comply with Local Rule 7.1(a)(3), which states:

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. <u>Each fact listed shall set forth a specific citation to the record where the fact is established</u>. . . . <u>Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion</u>.

N.D.N.Y. L.R. 7.1(a)(3) (first emphasis added). Thus, Defendants' motion may be denied for failing to comply with the Local Rules. Not surprisingly, given Defendants' statement of material facts, Plaintiff's response to Defendants' statement of material facts does not comply with the Local Rules, either. (Dkt. No. 125, at 5–6). In the interests of judicial economy, however, the Court has considered the motion on the merits and draws the facts from the parties' statements of material facts, exhibits, affidavits, and depositions.

---

[1] Plaintiff received a "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" in accordance with Local Rule 56.2. (Dkt. No. 113).

[2] As Defendants do not seek summary judgment as to any other cause of action, the Court does not address those causes of action, or the related facts, in this decision.

## III. FACTS

On October 18, 2012, at approximately 4:00 a.m., Plaintiff went into the Quick Check gas station in Kingston, New York and ordered a sandwich. (Dkt. No. 108-5, ¶ 3; Dkt. No. 108-2, at 8). Plaintiff paid for the sandwich and brought the receipt to the employee "that makes the sandwich." (Dkt. No. 108-2, at 8–9). Plaintiff was "checking the soups out," when he saw "out of the corner of [his] eye," the employee making his sandwich "lift the sandwich up, spit in [the] sandwich, and put it back down." (*Id*. at 9). Plaintiff said he was "not paying for that" and asked the cashier for his money back. (*Id*.). The cashier responded that if Plaintiff did not leave, she was "going to call the cops." (*Id*.). Plaintiff said "please do, call the cops" and that he was "going nowhere" and wanted his money back. (*Id*.). At 4:27 a.m., Defendant Spylios and Alvarez "were dispatched to the Quick Check . . . in response to reports of a 'disorderly male'" and Defendant Officer Grothkopp "was sent to assist." (Dkt. No. 108-4, ¶ 2).

Plaintiff testified that after the cashier said she was going to call the police, "a cop walks in," not "a cop that was called" but one that "happened to be coming in, probably getting ready to go on duty." Plaintiff stated that he explained the situation, and he and the "cop"[3] went outside "by the gas pumps," where Plaintiff explained "it to him again." (Dkt. No. 108-2, at 9–10). According to Plaintiff, at that point, "another cop," a Kingston Police Officer, "pulls up facing us," "jumps out of the car," and "comes over to the conversation" Plaintiff was having with the city court officer. (*Id*. at 10, 16).

Defendant Grothkopp asserts that he was the first officer to arrive and that that Plaintiff told him that an employee had "spit into his sandwich."[4] (Dkt. No. 108-4, ¶ 4). He states he

---
[3] Plaintiff states that this was a "city court officer" but does not otherwise identify him. (Dkt. No. 125, at 2).

[4] Defendant Grothkopp indicates that he and Plaintiff first spoke inside the Quick Check then moved outside. (Dkt. No. 108-4, ¶ 6).

3

asked Plaintiff for identification and that Plaintiff responded that "he would provide [it] after he'd received his money from the store clerk." (*Id.*). Defendant Grothkopp avers that he "then contacted" Officers Spylios and Alvarez "to ask for their location and informed that that the location was secure, but that Mr. Watson was being uncooperative." (*Id.* at ¶ 5).

Defendant Grothkopp states that while he was speaking to Plaintiff, Defendants Spylios and Alvarez arrived. (Dkt. No. 108-4, ¶ 7; Dkt. No. 108-2, at 13). Plaintiff testified that when he told the Kingston police officer "I want my fucking money back," the officer told him "to watch my mouth," to which Plaintiff responded "or what, and that is when it all started." (Dkt. No. 108-2, at 11). Plaintiff testified that Defendant Grothkopp "punched me in my face. He started choking me, brought me to the ground." (Dkt. No. 108-2, at 11; Dkt. No. 125, at 2). Plaintiff stated that after "they punched me in the face, they wrestled me to the ground, told me to stop resisting. I wasn't resisting, I was almost knocked out. I was unconscious, basically. The other officer was choking me, the one in the white shirt. He was choking me." (Dkt. No. 108-2, at 16–17). Plaintiff states that he was "assaulted by Brian Grothkopp . . . and maybe Christopher Spylios as well." (Dkt. No. 125, at 1). According to Plaintiff, Defendant Alvarez "just stood there" and "did not do anything" and that he "did not intervene"—even though he "seen what was going on, [h]e did not stop it." (Dkt. No. 108-3, at 13–14, 16). Plaintiff testified that Defendant Wilber was involved in the incident—that he "seen what happened and none of them had probable cause to do this to me."[5] (Dkt. No. 108-2, at 46).

Defendants recount the incident somewhat differently. Defendant Spylios states that "upon arriving at the scene," he exited his vehicle "and approached Officer Grothkopp, who was standing near the subject-male." (Dkt. No. 108-5, ¶ 4). Defendant Spylios asserts that

---

[5] Defendant Wilber states in his affidavit that he "was not present during Mr. Watson's arrest on October 18, 2012 and had absolutely no involvement and/or interaction with the arrest of the plaintiff." (Dkt. No. 108-6, ¶ 4).

"[P]laintiff appeared to be agitated and uncooperative with the staff and responding officers," "that his behavior appeared threatening," and that he "initially refused to leave the premises despite numerous requests." (Dkt. No. 108-5, ¶ 5). According to Defendant Spylios, "plaintiff was specifically given numerous verbal commands to stop yelling and leave the premises, or face arrest," but "continued to yell obscenities while outside on the street" and then "moved aggressively toward" Defendant Spylios. (Dkt. No. 108-5, ¶ 7). Defendant Grothkopp states that Defendant Spylios "responded by pushing [Plaintiff] away and attempting to grab his arm." (Dkt. No. 108-4, ¶ 8). Defendant Spylios asserts that he "then attempted to place plaintiff under arrest for his disorderly conduct" and that when "plaintiff . . . resisted the efforts to arrest him," he (Defendant Spylios) "struck plaintiff in an effort to subdue him." (Dkt. No. 108-5, ¶ 8). Defendant Grothkopp states that when he saw Defendant Spylios "struggle" with Plaintiff, he and Defendant Alvarez "assisted in placing him under arrest."[6] (Dkt. No. 108-4, ¶ 9).

Defendant Grothkopp placed Plaintiff in handcuffs and escorted him to the police vehicle; Defendant Spylios "assisted in placing [Plaintiff] in the back" of Defendant Grothkopp's vehicle. (Dkt. No. 108-4, ¶ 11; Dkt. No. 108-5, ¶ 11). Plaintiff testified that his nose was bleeding and that he was dizzy and had a headache following the arrest. (Dkt. No. 108-2, at 18, 25). He was charged with resisting arrest, disorderly conduct, and harassment. (Dkt. No. 125, at 33). All charges were later dismissed. (*Id.*).

## IV. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and

---

[6] The only evidence regarding the timing of the incident at issue is the "Call for Service" sheet Plaintiff submitted in opposition to Defendants' motion. It indicates that Defendants Grothkopp, Alvarez, and Spylios were dispatched at 4:27 or 4:28 a.m., Defendant Grothkopp arrived at 4:31 a.m., Defendants Alvarez and Spylios arrived at 4:34 a.m., Plaintiff was arrested at 4:36 a.m., and Defendant Wilber arrived at 4:39 a.m. (Dkt. No. 125, at 22).

that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Moreover, where plaintiff proceeds *pro se*, the Court must read his submissions liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2011) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)); *see also Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

## V. SECTION 1983 CLAIMS

### A. Excessive Force

Defendants argue that Plaintiff's excessive force claim must be dismissed because their actions were objectively reasonable under the circumstances. (Dkt. No. 108-8, at 7). The Supreme Court has held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). A determination of reasonableness under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Thus, an excessive force claim "is subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000) (citing *Graham*, 490 U.S. at 395–96). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Here, Plaintiff has raised an issue of fact as to whether Defendants Grothkopp and Spylios used excessive force in punching Plaintiff while he was explaining what had happened at

7

Quick Check and choking him as they brought him to the ground. Although Defendants have adduced evidence "plaintiff was specifically given numerous verbal commands to stop yelling and leave the premises, or face arrest," but "continued to yell obscenities while outside on the street and moved aggressively toward" Defendant Spylios and "resisted the efforts to arrest him," (Dkt. No. 108-5, ¶ 7–8 ), Plaintiff testified that when one of the officers told him "to watch [his] mouth," he responded "or what" and the officer punched him and started choking him. (*Id*. at 11). In addition, although Plaintiff testified that Defendant Alvarez observed the use of force and failed to intervene, the evidence Defendants submitted indicates that Defendant Alvarez "assisted in placing him under arrest," (Dkt. No. 108-4, ¶ 9), thus there is an issue of fact as to whether he was involved in the alleged use of force. Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court concludes he has raised a material issue of fact as to whether he resisted arrest or moved in a threatening manner toward the Defendant officers and whether the force Defendants Grothkopp, Spylios, and Alvarez used was objectively reasonable. *See Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015) (concluding that "a jury will have to decide whether Fourth Amendment reasonableness was exceeded" when the plaintiff was taken to the ground by police officers); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 505 (N.D.N.Y. 2010) (denying summary judgment on excessive force claim where "admissible record evidence exists from which a rational factfinder could conclude that Defendant's application of force was objectively unreasonable in light of the facts and circumstances confronting him").

    **B.    Failure to Intervene**

Defendants argue that Plaintiff's failure to intervene claims should be dismissed because: (i) Defendants Grothkopp, Spylios, and Alvarez cannot be liable for failure to intervene, as they are alleged to have been direct participants in the excessive use of force; and (ii) they and

8

Defendant Wilber had "no reasonable opportunity to intervene" during the incident. (Dkt. No. 108-8, at 11).

In general, "[a] police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008). In cases premised on excessive force, "an officer is excused from liability, despite his presence, if the assault is sudden and brief, such that there is no real opportunity to prevent it." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 429 n.9 (N.D.N.Y. 2009) (internal quotation marks omitted). When a police officer is "a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable." *Cuellar v. Love*, No. 11-cv-3632, 2014 WL 1486458, at *8, 2014 U.S. Dist. LEXIS 51622, at *23 (S.D.N.Y. Apr. 11, 2014).

When viewed in the light most favorable to Plaintiff, the evidence shows that (i) Defendants Grothkopp, Spylios, and Alvarez were in the area for duration of the incident; (ii) that Defendants Grothkopp, Spylios, and Alvarez did not attempt to stop the other(s) from using force against Plaintiff; and (iii) Plaintiff was not resisting arrest. Plaintiff has therefore raised a triable issue of fact as to whether Defendants Grothkopp, Spylios, and Alvarez should have known that the use of force against Plaintiff was excessive, had the opportunity to act to prevent it, and nevertheless failed to take reasonable steps to intervene. Although it is a close issue as to

9

whether any of these Defendants had an adequate opportunity to stop the other(s), in view of the factual issues concerning who punched and forcibly restrained Plaintiff, it is nevertheless a question of fact appropriate for determination by a jury.

Defendants are correct that a defendant "may not be held liable both for using excessive force and for failing to prevent the use of excessive force." *Buchy v. City of White Plains*, No. 14-cv-1806, 2015 WL 8207492, at *3, 2015 U.S. Dist. LEXIS 163469, at *3–4 (S.D.N.Y. Dec. 7, 2015). They may, however, be held liable for one or the other, as the Federal Rules of Civil Procedure recognize both that a party may "set out two or more statements of a claim . . . alternatively" and that "[a] party may state as many claims . . . as it has, regardless of consistency" between them. Fed. R. Civ. P. 8(d)(2), (3). Thus, "[t]he flexibility afforded by Rule 8 . . . is especially appropriate in civil rights cases," *Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999), "even at the summary judgment stage of litigation," *Polanco v. City of New York*, No. 14-cv-7986, 2018 WL 1804702, at *10, 2018 U.S. Dist. LEXIS 54758, at *27–28 (S.D.N.Y. Mar. 28, 2018). Accordingly, Plaintiff's failure to intervene claims against Defendants Grothkopp, Spylios, and Alvarez may proceed past summary judgment. *See id.* ("To the extent that defendants' motion for summary judgment relies on the abstract notion that both excessive force and failure to intervene claims may not proceed past summary judgment against the same defendant, we reject it."); *Cumberbatch v. Port Auth. of N.Y. & N.J.*, No. 03-cv-749, 2006 WL 3543670, at *11, 2006 U.S. Dist. LEXIS 3543670, at *35 (S.D.N.Y. Dec. 5, 2006) ("The Court will thus construe these claims as pleading in the alternative . . . *i.e.*, the Officers either used excessive force, or one or both of them failed to intervene while another officer used excessive force.").

Defendant Wilber asserts that he cannot be held liable for failing to intervene because "he was not present during Mr. Watson's arrest on October 18, 2012 and had absolutely no involvement and/or interaction with the arrest of the plaintiff." (Dkt. No. 108-6, ¶ 4). In response, Plaintiff submitted the call for service sheet which indicates that Defendant Wilber arrived at the scene at 4:39 a.m., and thus was present. (Dkt. No. 125, at 22). The call for service sheet, however, also indicates that Plaintiff was arrested at 4:36 a.m. Thus, even viewed in the light most favorable to Plaintiff, it indicates that Defendant Wilber arrived *after* the alleged excessive force. (*Id.*). Even crediting Plaintiff's testimony that Defendant Wilber saw "what happened," (Dkt. No. 108-2, at 46), there is no evidence regarding where Wilber was at the time, or whether he was close enough to take any action, and "under the law, mere presence is insufficient." *Corley v. Shahid*, 89 F. Supp. 3d 518, 523 (E.D.N.Y. 2015). "In order for a law enforcement officer to be held liable for another officer's use of excessive force, 'there must have been a realistic opportunity [for the former] to intervene to prevent the harm from occurring.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Here, Plaintiff has presented no evidence from which a reasonable factfinder could conclude that Defendant Wilber had a "realistic opportunity" to prevent the other Defendant officers from punching, choking, or forcibly restraining Plaintiff. *See id.* (affirming summary judgment where the plaintiff "did not proffer any evidence from which a juror could rationally infer that the officers who were present had a realistic opportunity to prevent" the defendant officer from jumping on the plaintiff's back).[7] Accordingly,

---

[7] To the extent Defendants seek summary judgment dismissing Defendant Wilber from this case in its entirety, *see* Dkt. No. 108-8, at 13 (arguing that "because Officer Wilber played no part in the arrest and alleged constitutional violations, any allegations against him must be dismissed in their entirety"), their motion is denied. Although Defendant Wilber is entitled to summary judgment on the failure to intervene claim, because Defendants have not briefed any of Plaintiff's remaining claims, including false arrest and deliberate indifference,, the Court has not considered Defendant Wilber's involvement in connection with those claims. Accordingly, Defendants' motion is denied.

Defendants' motion for summary judgment with respect to the failure to intervene claim is granted as to Defendant Wilber but otherwise denied.

## C. Qualified Immunity

Defendants argue that even if Plaintiff could establish a Fourth Amendment violation, the Defendant officers are protected by the doctrine of qualified immunity. (Dkt. No. 108-8, at 7–10). "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants bear the burden of establishing qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

The Second Circuit has recognized that "[t]he right of an individual not to be subjected to excessive force has long been clearly established." *Calamia v. City of New York*, 879 F.2d 1025, 1036 (2d Cir. 1989). As discussed above, Plaintiff has adduced evidence that the actions of Defendants Grothkopp, Spylios, and Alvarez violated his right to be free from excessive force or failed to intervene. Thus, the relevant inquiry is whether it was objectively reasonable for Defendants Grothkopp, Spylios, and Alvarez to believe that their actions did not violate that right. Because there are material issues of fact in dispute regarding whether Plaintiff complied with police commands, resisted arrest, and the amount of force used, the Court cannot conclude that it was objectively reasonable for Defendants Grothkopp, Spylios, and Alvarez to believe that their actions were lawful. *See Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) ("[B]ecause there is a factual dispute regarding whether Barboza's use of force was objectively unreasonable,

12

the Court rejects defendant Barboza's claim that she is entitled to qualified immunity."); *see also Picciano*, 723 F. Supp. 2d at 505 ("[I]t is impossible to 'determine whether [Defendant] *reasonably* believed that [his] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded.'") (quoting *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999)).

### D. Municipal Liability

Defendants City of Kingston and Kingston Police Department move for summary judgment dismissing Plaintiff's *Monell* claim, arguing that there is no evidence of any "policy or pattern on the part of the defendants." (Dkt. No. 108-8, at 13). Plaintiff responds that "the three cases filed against [him] from 1995–2012" "clearly demonstrate[] a pattern, or custom not against any one else but on the [sic] plaintiff himself." (Dkt. No. 125, at 17). In addition, Plaintiff asserts that there have been seven "excessive/false arrest" actions filed against the municipal defendants, which "show a pattern." (Dkt. No. 125, at 18).

It is well-established that a municipality may not be held liable under § 1983 on the basis of *respondeat superior*. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694–95 (1978). Rather, municipalities are responsible only for "their own illegal acts," *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986), and are not vicariously liable for civil rights violations perpetrated by their employees. *See Monell*, 436 U.S. at 691. In order to sustain a § 1983 claim for municipal liability, a plaintiff must show that he suffered a constitutional violation, and that the violation resulted from an identified municipal policy or custom. *Monell*, 436 U.S. at 694–95. A municipal policy or custom may be established where the facts show either: (1) a formal policy, officially promulgated by the municipality, *id.* at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur*, 475 U.S. at 483–84; (3) unlawful

13

practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Plaintiff advances a widespread practice theory of liability. A *Monell* claim "may be maintained based on a practice that 'was so persistent or widespread' as to constitute 'a custom or usage with the force of law.'" *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)). "The alleged custom or practice need not be embodied in a rule or regulation" but "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* (quoting *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)). "A plaintiff must also demonstrate a sufficient causal relationship between the violation and the municipal policy or practice." *Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016).

Here, Plaintiff has presented evidence that, in addition to the incident at issue in this case, Kingston police officers have twice subjected him to excessive force, once in 1995 when Kingston police officers hit him during an arrest and he was attacked by a police dog, and again on July 29, 2012, when he Kingston police officers choked him and wrestled him to the ground during an arrest "for obstructing governmental administration." (Dkt. No. 108-2, at 25–26, 35–37). These three instances, however, are insufficient to show "a practice that is 'so persistent or widespread' as to justify the imposition of municipal policy." *Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (finding the plaintiff's identification of "four examples where the defendants might have disclosed positive drug test results" was insufficient to show a persistent or widespread practice); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir.

2012) (finding that where the "Plaintiff's evidence showed two instances, or at the most three, over a period of several years in which a small number of officers" engaged in unconstitutional conduct, "and one incident in which an officer indicated a disposition" to do so, the "evidence fell far short of showing a policy, custom, or usage of officers engage in the alleged unconstitutional conduct "and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities").

Plaintiff also asserts that there are seven cases of "excessive force/false arrest filed against" Defendants City of Kingston and Kingston Police Department which evidence of the pattern or practice of excessive force during arrests. (Dkt. No. 125, at 18–19). Three of these cases, however, post-date his October 2012 arrest in this case, and therefore do not evidence a custom or policy in October 2012 of which supervisory authorities must have been aware. *See Jones*, 691 F.3d at 81. One of the cases cited by Plaintiff, *Clayton v. City of Kingston*, 44 F Supp. 2d 177 (2d Cir. 1999), did not involve a claim of excessive force or false arrest. Without evidence of the facts underlying the remaining three cases, whether Defendants investigated them, or how they were resolved, they fail to raise a question regarding a municipal policy or custom under *Monell*. *See Outlaw v. City of Hartford*, 884 F.3d 351, 379–80 (2d Cir. 2018) ("The lists of the lawsuits filed and the claims sent to the City's insurer might have led to evidence from which an inference of deliberate indifference to excessive force could properly be drawn, but as noted by the district court, there was no evidence as to the facts underlying those claims or how thoroughly they were investigated by the City. The simple fact that claims were made and that some of them were settled would not permit an inference that the City was deliberately indifferent in the supervision of HPD officers with respect to the use of excessive

15

force.").[8] Accordingly, Defendants' motion for summary judgment with respect to the *Monell* excessive force claim is granted.

## VI. CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 108) as to the excessive force claim against Defendant Wilber and the *Monell* excessive force claim is **GRANTED**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 108) is otherwise **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated: September 19, 2018

Brenda K. Sannes
U.S. District Judge

---

[8] To the extent Plaintiff advances a deliberate indifference theory of liability under *Monell*, *see Outlaw*, 884 F.3d at 372 ("[A] municipality may be liable even for its inaction if, in its failure to act, it 'exhibited deliberate indifference to constitutional deprivations caused by subordinates.'" (quoting *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)), it fails for the same reasons outlined above, *see id*. at 378–79 (affirming summary judgment finding that the evidence of other litigation, lawsuits filed, and expert evidence failed to show that the defendant city was deliberately indifferent in the supervision of its officers with respect to the use of excessive force).