# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

TYRRONE R. WATSON,

                                 Plaintiff,                      1:15-cv-01356 (BKS/DEP)

v.

BRIAN GROTHKOPP, EDDIE ALVAREZ, and
CHRISTOPHER SPYLIOS,

                                 Defendants.

---

**Appearances:**

Benjamin W. Hill
Law Office of Benjamin W. Hill, PLLC
50 State Street, Second Floor
Albany, NY 12207
*For Plaintiff*

Michael T. Cook
Cook, Netter, Cloonan, Kurtz & Murphy, P.C.
85 Main Street, P.O. Box 3939
Kingston, NY 12402
*For Defendants*

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Tyrrone Watson brought this action under 42 U.S.C. § 1983, alleging that Defendants Brian Grothkopp, Eddie Alvarez, and Christopher Spylios, all officers of the Kingston Police Department, violated his rights under the Fourth Amendment by employing excessive force (or failing to intervene during the use of excessive force) during his arrest on October 18, 2012. The case proceeded to a jury trial, held on March 11, 12, and 13, 2019. (Dkt. No. 165). The jury returned a verdict in favor of Plaintiff on his Fourth Amendment claim

against Defendant Christopher Spylios, and awarded Plaintiff $1 in nominal damages. (Dkt. No. 169, at 2).[1] Defendant Spylios now moves for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, arguing that he is entitled to qualified immunity. (Dkt. No. 180). Plaintiff opposes Defendant's motion. (Dkt. No. 181). For the reasons discussed below, Defendant's motion is denied.

## II. TRIAL EVIDENCE

Plaintiff's claim arises from an incident outside a QuickChek convenience store in Albany, New York, at approximately 4:30 a.m. on October 18, 2012. Plaintiff testified that he and a friend went to the QuickChek to get a sandwich after leaving a sports bar where Plaintiff had had "maybe three beers." Plaintiff testified that he paid for two sandwiches, but then demanded his money back after he saw a store employee who was making the sandwiches spit into one of the sandwiches. The ensuing confrontation led store employees to call the police. As described below, Plaintiff and the Defendant police officers dispute what happened next.

### A. Plaintiff's Testimony

Plaintiff testified that before the Defendant police officers arrived, a man Plaintiff recognized as a "city court officer"[2] walked into the store. At the officer's request, Plaintiff went outside to talk. Plaintiff told the officer what happened and said that he wanted his "F'ing" money back. The officer asked Plaintiff to calm down and suggested that they try to work the situation out.

---

[1] The jury found that Plaintiff failed to prove his claims of false arrest, false imprisonment and deliberate indifference to medical needs. (Dkt. No. 169, at 3–4).

[2] The "city court officer" was never identified. As discussed below, based on the testimony of Defendants Grothkopp and Spylios, the jury likely concluded that Grothkopp was in fact the "city court officer" who walked outside the store with Plaintiff, and that it was Spylios, not Grothkopp, who struck Plaintiff in the face.

2

While talking to the officer, Plaintiff saw a police patrol car arrive, and saw Defendant Grothkopp get out of his patrol car and walk up to them. Plaintiff saw another police vehicle approaching the QuickChek. At the time, Plaintiff was explaining the situation and said he wanted his "F'ing" money back. Grothkopp told Plaintiff: "Watch your mouth," and Plaintiff replied "Or what?" Grothkopp then punched Plaintiff in the face—mainly his nose—and Plaintiff fell to his knees. Plaintiff testified that the punch almost knocked him out; that he was in pain; and that his nose began bleeding. At the time of the punch, Plaintiff's arms were behind his back so as to pose no threats to the officers, and his fists were not balled. Plaintiff testified that he did not make any aggressive movements toward any officer prior to being struck. At the time Plaintiff was struck, Plaintiff saw Defendants Alvarez and Spylios getting out of their vehicle. After the punch, someone began choking Plaintiff from behind and telling him to stop resisting. Plaintiff stated that he was not resisting and that he was trying to regain his composure. One of the police officers—Spylios or Alvarez—put Plaintiff in a headlock. Plaintiff stated that the choking and headlock caused pain and that it felt like they were trying to take his life.

While he was still on his knees, the officers handcuffed Plaintiff. Plaintiff stated that his hands were already behind his back and that he was not struggling while being placed in handcuffs. Plaintiff did not know why he was being arrested or why he was punched. Plaintiff was placed in a police vehicle and taken to the Kingston Police Department. Plaintiff testified that he asked to be taken to the hospital because his nose was still bleeding, but that he was ignored.

At the police department, Plaintiff was processed, fingerprinted, and photographed. Plaintiff was wearing a white t-shirt in the booking photograph. Plaintiff testified that a Kingston police officer made him take off his tan hoodie, which was covered in blood, right before taking

3

the photograph. Plaintiff again requested to be taken to a hospital, but he was held in a jail cell until his arraignment. Plaintiff's nose stopped bleeding after about half an hour and he had a headache that lasted for about three hours after the incident. His nose was not broken.

### B. The Officers' Testimony Regarding Their Arrival on the Scene

Grothkopp testified that he received a call over dispatch at approximately 4:30 a.m. to intervene at QuickChek, where there was a subject inside who was acting in a disorderly manner being verbally abusive towards staff. Grothkopp arrived at the QuickChek at 4:31 a.m. He was the first officer on the scene and the only officer[3] at QuickChek before Alvarez and Spylios arrived. Upon entering the store, Grothkopp observed that Plaintiff was agitatedly yelling at an employee, asking for his money back, and using the "F word." Grothkopp approached Plaintiff, attempted to engage him, and asked for his name and identification. Plaintiff responded that he would give up that information when he got his money back. Grothkopp was concerned with Plaintiff's behavior because he was alone and Plaintiff probably outweighed him by 60 pounds. Grothkopp radioed Alvarez and Spylios, who had also received the dispatch call; Grothkopp asked for their location, and told them that the subject was uncooperative. Because Plaintiff was still trying to yell at the clerk and Grothkopp wanted to take Plaintiff out of the situation, he and Plaintiff went out of the store and stood near the entrance where they continued to talk.

When Grothkopp and Plaintiff got out to the sidewalk area, Alvarez and Spylios pulled up. Plaintiff continued to yell about the clerk spitting in his sandwich. Grothkopp tried to calm Plaintiff down. According to Grothkopp, Plaintiff never left his agitated state; although Grothkopp advised Plaintiff to leave the property several times, Plaintiff continued to stay there

---

[3] Grothkopp did not see a "city court officer" at the QuickChek.

and yell and use profanity. Grothkopp testified that there was some alcohol on Plaintiff's breath and that Plaintiff appeared intoxicated.

Spylios testified that, while they were en route, they overheard Grothkopp on the radio and could hear a male yelling and screaming in the background. When they arrived at the QuickChek, Spylios saw Grothkopp and Plaintiff exiting the store; Plaintiff was agitated and yelling obscenities.

### C. The Officers' Testimony Regarding the Arrest and the Altercation

#### 1. Spylios' Testimony

Spylios got out of his vehicle and told Plaintiff to lower his voice, watch his mouth, and leave. Plaintiff, however, continued yelling and appeared to be uncooperative. Spylios thought Plaintiff was intoxicated because they were unable to reason with him and calm him down. When Plaintiff was about six feet away, Spylios told Plaintiff that he should "shut his mouth" or he would be arrested. Plaintiff responded "or what motherfucker," and moved toward Spylios in an aggressive manner with his hands clenched. At that point Grothkopp and Alvarez were standing off to the side. Spylios felt threatened, pushed Plaintiff back, and told Plaintiff he was under arrest. A struggle ensued and, as Spylios attempted to arrest Plaintiff, Plaintiff actively resisted arrest; he did not put his hands behind his back and was trying to break free. Grothkopp and Alvarez then came over to assist. Spylios struck Plaintiff with a clenched right fist to the right side of Plaintiff's face during the struggle with the officers. Plaintiff then asked, "Who the fuck hit me? I know it wasn't you Alvarez."[4] Following the strike, Spylios was able to subdue Plaintiff while one of the other officers handcuffed him. Spylios testified that he did not see any blood on Plaintiff and that Plaintiff did not complain of pain or seek medical treatment.

---

[4] Alvarez knew Plaintiff, as they had grown up together.

5

### 2. Grothkopp's Testimony

Grothkopp testified that after Spylios told Plaintiff to leave, Plaintiff approached Spylios in a quick, aggressive manner. Plaintiff was close enough to Spylios that Spylios had to push him back. Grothkopp and Alvarez had just started a conversation when Grothkopp saw Plaintiff and Spylios wrestling alongside a parked vehicle in the area. Grothkopp and Alvarez immediately went over to assist Spylios, who was struggling to get an arm behind Plaintiff's back to place him into custody. Grothkopp testified that Plaintiff was actively resisting arrest by not placing his arms behind his back. Grothkopp testified that he did not punch Plaintiff and that he did not see anyone punch Plaintiff. Grothkopp testified that he did not see any blood on Plaintiff and that Plaintiff did not complain of pain or seek medical treatment.

### 3. Alvarez's Testimony

Alvarez saw Spylios walk toward Plaintiff, and noticed that Plaintiff was very loud, boisterous, cursing, and yelling. Alvarez walked past Plaintiff to talk to Grothkopp about the situation. As Alvarez was talking to Grothkopp, he heard "a verbal back and forth" between Plaintiff and Spylios and heard Spylios ask Plaintiff to lower his voice. Alvarez then heard a bang, turned around, and saw Spylios and Plaintiff wrestling against a car. Spylios and Plaintiff were almost grappling with each other, like a standing wrestling match. Alvarez and Grothkopp then approached to help place Plaintiff under arrest. Plaintiff was not complying with the arrest: he was pulling away as the three officers were trying to turn him around to get his hands behind his back. Alvarez placed Plaintiff in handcuffs. Alvarez testified that he did not see Spylios strike Plaintiff, and that he did not see any blood on Plaintiff. Alvarez did not hear Plaintiff request medical treatment.

### D. Police Records

Police records indicate that Plaintiff was arrested at 4:36 a.m., two minutes after Spylios and Alvarez had arrived. (Def. Exh. 2). Plaintiff was charged with disorderly conduct and resisting arrest. (*Id.*).

Spylios testified that a special report has to be prepared anytime there is a use of force. He believed that he prepared one, but there was no record of it. Plaintiff introduced the special reports prepared by Grothkopp and Alvarez; neither of their reports mentioned a strike by Spylios. (Pl. Exhs. 2, 4).

## III. JURY INSTRUCTIONS AND VERDICT

### A. Jury Instructions

Following the close of proof, the Court instructed the jury regarding excessive force as follows:

> The Fourth Amendment to the United States Constitution protects persons from being subjected to excessive force while being arrested. In other words, a law enforcement official may only employ the amount of force reasonably necessary under the circumstances to make the arrest.
>
> In the instant case, Plaintiff claims that he was subjected to excessive force by Defendants when Defendants arrested Plaintiff. To determine whether a Defendant's acts caused Plaintiff to suffer the loss of a federal right, you must determine whether the amount of force used to effect the arrest was that which a reasonable officer would have employed in effecting the arrest under similar circumstances.
>
> . . . .
>
> In making this determination, you may take into account such factors as the severity of the crime at issue, whether Plaintiff posed an immediate threat to the safety of a Defendant or others, and whether Plaintiff actively resisted arrest or attempted to evade arrest by flight. However, you do not have to determine whether the Defendant had less intrusive alternatives available, for the Defendant need only to have acted within that range of conduct

> identified as reasonable. If you find that the amount of force used
> was greater than a reasonable person would have employed, Plaintiff
> will have established the claim of loss of a federal right.

(Dkt. No. 167, at 17–18).

### B. The Jury's Verdict

The jury returned a verdict finding that Plaintiff proved by a preponderance every element of his Fourth Amendment excessive force or failure-to-intervene claim against Defendant Spylios but not against Defendants Grothkopp or Alvarez. (Dkt. No. 169, at 2).[5] The jury awarded Plaintiff $1 in nominal damages and found Plaintiff was not entitled to an award of punitive damages. (Dkt. No. 169, at 2).

## IV. QUALIFIED IMMUNITY STANDARD

Even after a jury has found that an officer used excessive force, "the doctrine of qualified immunity will shield that officer from liability for damages if his 'conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018). A court may grant qualified immunity after a jury finding of liability for excessive force "if an officer has made a reasonable mistake of law, i.e., if the constitutional violation he has committed was not a 'clearly established' violation." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 662 (E.D.N.Y. 2017). "The qualified immunity standard is an objective standard, asking not whether the defendant officer acted in good faith or what he himself knew or believed, but rather what would have been known to or believed by a reasonable officer in the defendant's position." *Outlaw*, 884 F.3d at 367. "Because the 'use of force is contrary to the Fourth Amendment if it is excessive under

---

[5] The jury was asked whether Plaintiff proved his "excessive force or failure to intervene claim" as against Defendants. (Dkt. No. 169, at 2). The parties agree that the finding against Defendant Spylios was for excessive force. (*See, e.g.*, Dkt. No. 180-1, at 4; Dkt. No. 181, at 1).

objective standards of reasonableness,'. . . the two . . . inquiries may 'ultimately converge on one question in excessive force cases: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful.'" *Weather v. City of Mount Vernon*, 474 F. App'x 821, 823 (2d Cir. 2012) (summary order) (first quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001), then *Cowan v. Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003)).

Qualified immunity is an affirmative defense that a defendant bears the burden of proving. *Outlaw*, 884 F.3d at 367. "To the extent that a particular finding of fact [i]s essential to an affirmative defense, . . . it [i]s incumbent on [the defendant] to request that the [factfinder] be asked the pertinent question." *Id.* (quoting *Kerman v. City of New York*, 374 F.3d 93, 120 (2d Cir. 2004) (markings in original).[6]

## V. ANALYSIS

Defendant Spylios argues that he is entitled to qualified immunity because he:

> acted in good faith in utilizing the amount of force he deemed necessary to protect himself and the other officers involved in the arrest. . . ; [his] actions were objectively reasonable under the circumstances as the record establishes that the plaintiff was a threat to the safety of the officers or, at the very least, it was objectively reasonable for Officer Spylios to believe that and therefore, force was necessary to restrain the plaintiff.

(Dkt. No. 180-1, at 5). Defendant also argues that there is no precedential authority demonstrating that his conduct violated Plaintiff's clearly established rights. (*Id.* at 8).

---

[6] Defendant has not raised any issue regarding the Court's decision not to give the jury the special interrogatories proposed by Defendants. (Dkt. No. 162, at 2), *see Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (explaining that when material facts pertaining to immunity are in dispute, the appropriate procedure is to allow the jury to resolve any disputed facts that are material to the qualified immunity issue). The Court declined to give the proposed interrogatories because the questions would not resolve disputes of material fact that would aid in the qualified immunity determination. *See, e.g.*, *Alla v. Verkay*, 979 F. Supp. 2d 349, 370 (E.D.N.Y. 2013) (declining to give special interrogatories where "even affirmative responses would have been insufficient to give rise to qualified immunity").

Plaintiff, on the other hand, correctly notes that the test is objective reasonableness, not subjective good faith. *Outlaw*, 884 F.3d at 367. Plaintiff further argues that the verdict establishes that the jury did not credit Spylios' testimony, and "because the jury was instructed to determine whether the amount of force used was reasonable under the circumstances, a ruling that qualified immunity applies would be utterly inconsistent with that verdict." (Dkt. No. 181, at 1).

### A. The Jury's Verdict

Here, the jury was instructed that "a law enforcement official may only employ the amount of force reasonably necessary under the circumstances to make an arrest." (Dkt. No. 167, at 17). The jury was charged with determining whether the defendants acted reasonably, taking into account "such factors as the severity of the crime at issue, whether Plaintiff posed an immediate threat to the safety of a Defendant or others and whether Plaintiff actively resisted arrest or attempted to evade arrest by flight." (*Id.* at 18); *See, e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). Thus, in finding that Spylios was liable for excessive force, the jury must have found that the use of force in this situation was "unreasonable in light of the totality of the circumstances." *Weather v. City of Mount Vernon*, 08-cv-192, 2011 WL 1046165, at *10, 2011 U.S. Dist. LEXIS 29297, at *25 (S.D.N.Y. Mar. 22, 2011). [7]

### B. Clearly Established Right

"For law to be clearly established," while "it is not necessary to identify a case directly on point," "precedent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate." *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019). "Specifically, the law must be so clearly established with respect to the '*particular* conduct' and the 'specific

---

[7] Defendant has not challenged the sufficiency of the evidence to support the jury's verdict.

context' at issue that 'every reasonable official would have understood that his conduct was unlawful.'" *Id.* at 68–69 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (emphasis in original) (internal quotation marks omitted). In excessive force cases, the inquiry into whether a right was clearly established "tends to converge with the first [factor] in excessive force cases, with the question ultimately being whether, in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." *Weather*, 474 F. App'x at 824 (citing *Cowan*, 352 F.3d at 765 n.7).

With respect to the particular conduct here, the Court notes that the arrest was for minor charges: disorderly conduct and resisting arrest. Disorderly conduct is a violation, *see* N.Y. Penal Law § 240.20, and the underlying facts, as testified to by the officers, are verbally abusing the QuickChek employees, yelling, boisterousness, and swearing. *See Brown v. City of New York*, 798 F.3d 94, 102 (2d Cir. 2015) (finding that "the severity of the crime is unquestionably slight," explaining that "[t]he disorderly conduct offense is subject to a maximum penalty of fifteen days in jail, and the underlying facts, even as alleged by the officers, are loud banging on the door of a closed store by someone wanting to use a bathroom, plus the use of loud and nasty language"). Regarding the resisting-arrest charge, there is no evidence that Plaintiff attempted to flee; although Officers Grothkopp and Alvarez both described a "wrestling match," their description of the struggle centered on Plaintiff's attempt to pull away while they were trying to get his hands behind his back to handcuff him. There was no evidence that Plaintiff physically attacked or attempted to attack[8] any officer. Thus, the crimes were not severe. *See id.* (concluding that "the severity of the crime is unquestionably slight" where the plaintiff was charged with resisting

---

[8] At most, according to Spylios, Plaintiff moved toward Spylios in an "aggressive" manner before the struggle to arrest began. No officer testified that Plaintiff attacked or threatened to attack them.

11

arrest and "was not fleeing," "nor physically attacking an officer," "nor even making a move that an officer could reasonably interpret as threatening an attack," and that "[a]t most, her 'resistance' was a refusal to permit the easy application of handcuffs by placing her hands behind her back").

Spylios argues that he "was fearful of his safety and reasonably believed that force was needed to restrain Mr. Watson." (Dkt. No. 180-1, at 9). Spylios asserts that the proof at trial established that, when he arrived at the QuickChek in response to a "disorderly subjects" call, he saw Grothkopp informing Plaintiff that "he should leave and get a sandwich somewhere else" and that he (Spylios) "reiterated that Plaintiff should leave the premises." (Dkt. No. 180-1, at 8). According to Spylios, when he repeated Grothkopp's recommendation that Plaintiff leave the premises, Plaintiff responded "or what motherfucker," and advanced toward him, at which point Spylios pushed Plaintiff back, told Plaintiff he was under arrest, and tried to handcuff Plaintiff as he resisted. Spylios asserts that he then struck Plaintiff in order to "subdue him and complete the arrest." (Dkt. No. 180, at 8). But Plaintiff testified that he was struck in response to his "Or what?" retort, that he made no aggressive movements toward any officer prior to the punch, and that the officers did not attempt to handcuff or arrest him until *after* the punch. Plaintiff also testified that he was not resisting arrest, and the Court must consider the evidence in the light most favorable to the Plaintiff. *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007); *see, e.g.*, *O'Hara v. City of New York*, 570 F. App'x 21, 24 (2d Cir. 2014) (summary order) (reviewing district court's denial of posttrial finding of qualified immunity and rejecting the defendant officer's assertion that "a reasonable officer might have understood" the plaintiff "to be resisting

arrest," noting that the plaintiff had testified "that he was struggling to avoid" the defendant officer's "blows" and that the court "must assume the jury credited that explanation").

Under these circumstances, in the absence of any aggressive or threatening physical movement, no reasonable officer would have believed that the law authorized him, or that it was necessary, to punch Plaintiff in the face following a verbal retort in order to effect an arrest for a relatively minor matter. Indeed, it was clearly established in 2012, when this incident occurred, that a "punch to an arrestee's face is an unreasonable use of force where the suspect has not physically provoked or threatened officers on the scene." *Cox v. Fischer*, 248 F. Supp. 3d 471, 482 (S.D.N.Y. 2017); *see also O'Hara*, 570 F. App'x at 23–24 (concluding that, where officers were arresting the plaintiff for a "relatively minor matter," "no reasonable officer . . . could have thought that the law authorized him repeatedly to punch an unarmed, non-menacing 17 year old in effecting an arrest"); *see also Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) ("Taking the evidence in the light most favorable to Chalco, as we must, with no justification Belair punched Chalco in the mouth hard enough to draw blood, which violated clearly established law."); *Jackson*, 236 F. Supp. 3d at 663–64 (explaining that "[it] is clearly established that an officer punching someone in the face unprovoked violates that person's rights" and finding "that no reasonable officer would have found that Plaintiff's action in getting up from the ground after Czulada pushed him, unprovoked, constituted a threat that justified Czulada punching Plaintiff in the face").[9]

Finally, there was no evidence at trial that suggests Spylios "made a mistake regarding

---

[9] Plaintiff argues that qualified immunity is unwarranted, even assuming that the punch occurred during the arrest. *See* Dkt. No. 181 (noting that "at the time Spylios punched Watson in the face . . . Watson was surrounded by three police officers, had his hands down, was unarmed, and did not pose any kind of threat to Spylios"). The Fourth Amendment right to not be subjected to excessive force during an arrest was clearly established at the time of this arrest. *Outlaw*, 884 F.3d at 367. Again, considering the facts in the light most favorable to Plaintiff, and assuming that the punch occurred as Spylios described, when there were three officers present for this minor arrest, Plaintiff had his hands down, did not attempt to flee, did not make any threatening gesture or physically attack an officer, no

13

his legal obligations such that would excuse his actions." *Weather*, 474 F. App'x at 824. Thus, "it would be clear to a reasonable officer in [Spylios'] position that his conduct was unlawful in the situation he confronted. *Cowan*, 352 F.3d at 764–65. Accordingly, the Court finds that Defendant Spylios is not entitled to qualified immunity.

## VI. CONCLUSION

For these reasons, it is

**ORDERED** that Defendant Spylios' motion for judgment of a matter of law (Dkt. No. 180) is **DENIED.**

**IT IS SO ORDERED.**

**Dated: July 30, 2019**

Brenda K. Sannes
U.S. District Judge

---

reasonable officer in Spylios' position would have believed that the law permitted him to punch Plaintiff in the face. *See Cox,* 248 F. Supp. 3d at 482 (finding it clearly established that "an officer uses excessive force by punching an arrestee in the jaw and forcing him to the ground, where the arrestee is suspected of a relatively minor offense and, despite failing to immediately comply with an officer's order to put his hands on the wall, is not physically resisting arrest, making any threatening gesture, or attempting to flee"); *Edwards v. Cornell*, No. 13-cv-878, 2017 WL 5719144, at *10, 2017 U.S. Dist. LEXIS 195146, at *27 (D. Conn. Nov. 28, 2017) ("For the same reasons a reasonable jury could find that the force used was excessive, the Court cannot find that the force used was objectively reasonable for qualified immunity purposes."); *Davis v. Clifford*, 825 F.3d 1131, 1137 (10th Cir. 2016) ("[I]t is . . . clearly established law that the use of disproportionate force to arrest an individual who has not committed a serious crime and who poses no threat to herself or others constitutes excessive force.").